### John DOE, Plaintiff,

v.

### William F. WARD, in his official capacity as the Chairman of the Pennsylvania Board of Probation and Parole; and Jeffery Miller, in his official capacity as the Commissioner of the Pennsylvania State Police, Defendants.

### No. Civ.A. 98–1746.

United States District Court,
W.D. Pennsylvania.

Sept. 18, 2000.

Karl Baker, Defender Association of Philadelphia, Philadelphia, PA, Kirk Henderson, Pittsburgh, PA, Witold J. Walczak, Pittsburgh, PA, for plaintiff.

Thomas F. Halloran, Office of the Attorney General, Pittsburgh, PA, for defendants.

## MEMORANDUM OPINION

CINDRICH, District Judge.

This action arises from the application of the Pennsylvania Registration of Sexual Offenders Act, popularly known as "Megan's Law," 42 Pa.Cons.Stat. Sections 9791–9799.6 (also referred to herein as the "Original Act"), amended by S.B. No. 380, 184th Reg.Sess., Act No. 2000–18, 2000 Pa.Legis. Service. No. 2 at pp. 53–68

(referred to generally herein as the "Amended Act")[1], to plaintiff John Doe ("Doe").[2] Doe filed the instant complaint seeking preliminary and permanent injunctive relief in connection with the defendants' application of the Original Act to him to the extent that he has been subjected to community notification for an out-of-state conviction. Doe asserts the following claims in his complaint:

**Count One:** violation of right to travel, as guaranteed by the Equal Protection Clause of the Fourteenth Amendment and the Privileges and Immunities Clause of Article IV, Section 2 of the United States Constitution;

**Count Two:** deprivation of liberty and property interests without procedural due process in violation of the Fourteenth Amendment to the United States Constitution;

**Count Three:** punishment in violation of the *Ex Post Facto* Clause of Article I, Section 9, Clause 3 of the United States Constitution; and

**Count Four:** violation of right to travel, as guaranteed by the Privileges and Immunities Clause of the Fourteenth Amendment to the United States Constitution.

Simultaneous with the filing of the complaint, Doe also filed a motion for a temporary restraining order and/or a preliminary injunction. The parties later entered into an agreement which resolved this motion for immediate relief and thereafter indicated to the court that there were no genuine disputes of material fact and that the remaining issues could be decided on cross-motions for summary judgment. Pending before the court are the parties' cross-motions for summary judgment.

1. Specific citation to the Amended Act appear herein as "Act No. 2000–18 Section *(Pennsylvania Consolidated Statutes section number as it appears in Act No. 2000–18)*".

2. John Doe is a pseudonym being used to protect the plaintiff's identity.

## I. Background

### A. Pennsylvania's Megan's Law

The Original Act was signed into law on October 24, 1995. In general, the Original Act required (1) registration with the Pennsylvania State Police (the "State Police") by individuals convicted of certain predicate offenses enumerated in the Act and (2) community notification for such offenders who were later deemed to be a "sexually violent predator" as defined in the Act. The community notification provisions of the Original Act had an effective date of April 22, 1996. An amendment to the Original Act was passed on May 22, 1996, effective immediately, which added Section 9793(d) and substantially revised Section 9795(c), the two provisions which are the primary subject of Doe's complaint as they both deal with out-of-state offenders.

Subsequent to Doe's filing of the complaint, the Pennsylvania Supreme Court ruled in *Commonwealth v. Williams,* 557 Pa. 285, 733 A.2d 593 (1999) that the provisions of the Original Act which related to the designation of sexually violent predators were unconstitutional. In an apparent response to the *Williams* decision, the Pennsylvania legislature passed the Amended Act, which was signed into law by the governor on May 10, 2000 and took effect within sixty days of that date.

Although the out-of-state offender provisions previously codified at Sections 9793(d) and 9795(c) were substantially changed in the Amended Act, Doe's counsel argued in a letter to the court dated May 10, 2000 that the constitutional infirmities alleged in the complaint had not been cured by the Amended Act.[3] Still, the court deemed it necessary to give the parties an opportunity to submit supplemental

3. The May 10, 2000 letter has been docketed (see Doc. No. 28) and made part of the case file.

briefs to address any issues that may have arisen as a result of the intervening legislation. Doe filed a supplemental brief indicating again that the case is ripe for decision. The defendants filed nothing.

As we explain in greater detail below, we agree with Doe that the potential harm which he alleges was not cured by the Amended Act. Our ruling on the parties' motions will be a ruling on the Amended Act, as any further community notification in connection with Doe would be done pursuant to the Amended Act and any issue arising under the Original Act are now moot.

1) *Registration*

Any one convicted of committing or attempting to commit one of the sex-related crimes listed at Section 9795.1 of the Amended Act is an "offender" subject to registration with the State Police. Act No. 2000–18 Section 9795.1. The term of registration, either ten years or lifetime, depends upon the particular crime of conviction and the number of convictions.

(i) *Ten Year Registration—Section 9795.1(a)(1)*

An individual who is convicted of committing or attempting to commit one of the following crimes, as listed at Section 9795.1(a)(1), is required to register with the State Police for a period of ten years:
- —18 Pa.C.S. Section 2901 (relating to kidnaping) where the victim is a minor;
- —18 Pa.C.S. Section 3126 (relating to indecent assault), where the offense is a misdemeanor of the first degree;
- —18 Pa.C.S. Section 4302 (relating to incest), where the victim is 12 years of age or older but under 18 years of age;
- —18 Pa.C.S. Section 5902(b) (relating to prostitution and related offenses), where the actor promotes the prostitution of a minor;
- —18 Pa.C.S. Sections 5903(a)(3), (4), (5), or (6) (relating to obscene and other sexual materials and performances), where the victim is a minor;
- —18 Pa.C.S. Section 6312 (relating to sexual abuse of children); and
- —18 Pa.C.S. Section 6318(relating to unlawful contact or communication with a minor);

Act No. 2000–18 Section 9795.1(a)(1).

(ii) *Lifetime Registration—Sections 9795.1(b)(1) and (2)*

An individual with two or more convictions of committing or attempting to commit any of the offenses set forth in Section 9795.1(a)(1) is subject to lifetime registration with the State Police. Act No. 2000–18 Section 9795.1(b)(1).

An individual who is convicted of committing or attempting to commit one of the following crimes, as listed at Section 9795.1(b)(2), is also subject to lifetime registration with the State Police:
- —18 Pa.C.S. Section 3121 (relating to rape);
- —18 Pa.C.S. Section 3123 (relating to involuntary deviate sexual intercourse);
- —18 Pa.C.S. Section 3124.1 (relating to sexual assault);
- —18 Pa.C.S. Section 3125 (relating to aggravated indecent assault);
- —18 Pa.C.S. Section 4302 (relating to incest), when the victim is under 12 years of age.

Act No. 2000–18 Section 9795.1(b)(2).

(iii) *Lifetime Registration—Section 9795.1(b)(3)*

An individual deemed to be a "sexually violent predator" is also subject to lifetime registration. Act No. 2000–18 Section 9795.1(b)(3). The Act defines a "sexually violent predator" as an individual who has been convicted of any criminal offense list-

ed at either Section 9795.1(a)(1) or (b)(2) and who is also

determined to be a sexually violent predator under section 9795.4 (relating to assessments) due to a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses. The term includes an individual determined to be a sexually violent predator where the determination occurred in another state, territory, federal court, the District of Columbia, or by court martial.

Act No. 2000–18 Section 9792.

Section 9795.4 requires a court to order an assessment of every individual convicted of an offense listed at either Section 9795.1(a)(1) or (b)(2) prior to sentencing. Act No. 2000–18 Section 9795.4. The order for assessment is sent to the administrative officer of the State Sexual Offenders Assessment Board (the "Board"), which is comprised of Governor appointed psychiatrists, psychologists and criminal justice experts with an expertise in the behavior and treatment of sexual offenders. Act No. 2000–18 Section 9799.3. A board member is designated to conduct an assessment of the individual to determine if the individual should be classified as a sexually violent predator. Act No. 2000–18 Section 9795.4. The board member's assessment shall include, among other things, an examination of the facts of the current offense; the individual's prior offense history; and the individual's characteristics. Id.

The Board must then submit an assessment to the district attorney in a written report no later than 90 days from the date of conviction of the individual. Id. The district attorney may then seek to have the individual designated a sexually violent predator by filing a praecipe with the court. Id. The Commonwealth has the burden of proof by clear and convincing evidence in such proceeding. Id.

Upon the filing of a praecipe by the district attorney, the court must hold a hearing to determine whether the individual is a sexually violent predator. Id. The district attorney must serve a copy of the praecipe on defense counsel together with a copy of the Board's report. Id. Both the individual and the district attorney must be given an opportunity at the hearing to be heard; the right to call witnesses; the right to call expert witnesses; and the right to cross-examine witnesses. Id. The individual has the right to counsel and to have a lawyer appointed to represent him if he cannot afford one. Id. Based on the evidence presented at the hearing, the court must determine whether the Commonwealth has proved by clear and convincing evidence that the individual is a sexually violent predator. Id.

### 2) Community Notification

In addition to lifetime registration, the Amended Act mandates that offenders designated sexually violent predators be subjected to broad community notification by the police. Act No. 2000–18 Section 9798. More specifically, the Amended Act requires the chief law enforcement officer of the police department of the municipality where a sexually violent predator lives (the "chief law enforcement officer") to distribute a written notice of the sexually violent predator's presence in the community.[4] Id. The Amended Act provides that the notice shall contain (i) the name of the convicted sexually violent predator; (ii) the address or addresses at which he resides; (iii) the offense for which he was convicted; (iv) a statement that he has been determined by a court order to be a sexually violent predator, which determination has

---

**4.** The Amended Act requires the State Police to create and maintain a registry of offenders and sexually violent predators. Act No. 2000–18 Section 9799.1(1). Within 72 hours of receiving an offender's or sexually violent predator's registration, the State Police notify the chief law enforcement officer of the municipality in which an offender or sexually violent predator resides of the fact that the offender or sexually violent predator has been registered with the State Police. Act No. 2000–18 Section 9799.1(4).

or has not been terminated as of a date certain; and (v) a photograph of the sexually violent predator. Act No. 2000–18 Section 9798(a)(1). The Amended Act further provides that the chief law enforcement officer shall provide the notice to the following individuals:

—neighbors;[5]

—the director of the county children and youth service agency of the county where the sexually violent predator resides;

—the superintendent of each school district and the equivalent for each private and parochial school in the municipality where the sexually violent predator resides;

—the licensee of each certified day care center and licensed preschool program and owner/operator of each registered family day-care home in the municipality where the sexually violent predator resides; and

—the president of each college, university and community college located within 1,000 feet of the sexually violent predator's residence.[6]

Act No. 2000–18 Section 9798(b). The Amended Act also directs the chief law enforcement officer to make the information contained in the notice "available,

upon request, to the general public."[7] Act No. 2000–18 Section 9798(d). Presumably, the chief law enforcement officer may post such information on the Internet as the Amended Act further provides that the information may be provided by electronic means. *Id.*

### 3) *Out–Of–State Offenders*
#### *i) The Original Act*

Prior to the passage of the Amended Act, out-of-state offenders were covered by Sections 9793(d)[8] and 9795(c) of the Original Act. Section 9795(c), which is the focus of Doe's claims, provided that

[a]s a condition of obtaining residency in Pennsylvania under the interstate compact for the supervision of parolees and probationers, sexual offenders from other states shall be required to register and abide by the requirements of this subchapter and, where the Pennsylvania Board of Probation and Parole determines it is necessary to protect the public, shall submit to public notification. . . .

42 Pa.Cons.Stat. Section 9795(c).

On September 11, 1997, the Pennsylvania Board of Probation and Parole (the "Board") adopted a policy pursuant to Section 9795(c) of the Original Act which required as a condition of obtaining residency in Pennsylvania under the Pennsylvania

**5.** "Neighbors" is defined in the Pennsylvania Administrative Code (the "PA Code") as "those persons occupying residences or places or employment, or both, located within a 250 foot radius of a sexually violent predator's residence, or the 25 most immediate residences and places of employment in proximity to the sexually violent predator's residence, whichever is greater." 37 Pa.Code Ch. 55.4 (2000). The Amended Act provides that the notice to neighbors must be provided by the chief law enforcement officer within 72 hours of his learning of the offender's release date and residence. Act No. 2000–18 Section 9798(c)(1). The chief law enforcement officer must provide the notice to all other persons within seven days of such date. Act No. 2000–18 Section 9798(c)(2).

**6.** The PA Code provides that school superintendents, principals, day care directors and

college presidents shall "disseminate the information regarding the sexually violent predator to individuals whose duties include supervision of or responsibility for students." 37 Pa.Code Ch. 56.4(1) and (2). Such individuals include "administrators, teachers, teachers aids, security officials, crossing guards, grounds keepers, bus drivers and the like." 37 Pa.Code.Ch. 56.4(2).

**7.** The PA Code provides that the chief law enforcement officer should give consideration to taking the additional step of establishing "a log of individuals not specifically mentioned . . . [in the Act] to whom sexually violent predator information is provided." 37 Pa. Code Ch. 56.3(f).

**8.** Section 9793(d) required out-of-state sex offenders to register with the State Police.

Interstate Compact Concerning Parole statute, 61 Pa.Stat.Ann. Section 321 (the "Parole Compact") [9], that out-of-state sexual offenders register with the State Police and submit to community notification. S–23.[10] To facilitate compliance with this condition, all out-of-state sex offenders applying for supervision under the Parole Compact were required to acknowledge and sign a "Pennsylvania State Police Sexual Offender Registration Notification" form and a "Pennsylvania State Police Sexual Offender Registration" form. S–23. The policy also required out-of-state sex offenders to sign an "Addendum to Application for Compact Services/Agreement to Return" form acknowledging that he or she may be subject to community notification if he or she resides in Pennsylvania.[11] S–23. In accordance with the policy, therefore, there was no individualized determination by the Board as to which out-of-state sex offenders should initially be subjected to community notification. S–39. All out-of-state sex offenders were automatically subject to community notification. S–39.

9. The Parole Compact is an agreement entered into by the states which governs the movement of parolees and probationers among the states. As explained by the Commonwealth Court of Pennsylvania in *Aveline v. Pennsylvania Board of Probation and Parole*, 729 A.2d 1254, 1257–58 (Pa.Comwlth.1999):

> [P]rior to its enactment, the movement of parolees or probationers to other states was done on an informal basis or by "gentlemen's agreements" between the states. The Council of State Governments, Handbook On Interstate Crime, 1 (ed. 78). However, problems arose because such agreements did not clearly establish the responsibilities of the receiving states in supervision of the parolee or probationer or the rights of a sending state to request the return of that individual. Because of these and other problems, in 1935, state officials drafted a proposed compact that sought to facilitate the interstate supervision of parolees and probationers because:
>
>> due to the existence of family in another state, better opportunities for employment there, or similar reasons, rehabilitation of a parolee or a probationer can be facilitated by transfer to that jurisdiction,

*ii) The Amended Act*

Section 9795(c) was deleted from the Amended Act, though its contents, along with the Board's September 11, 1997 policy, were essentially repeated in a December 21, 1998 amendment to the Pennsylvania Board of Probation and Parole Law (the "PBPPL"), 61 Pa.Stat.Ann. Sections 331.1 *et seq.* Section 331.33(d)(3) was added to the PBPPL as part of the December 21, 1998 amendment which provides that any out-of-state "parolee or probationer convicted of a sexual offense shall be required to . . . [s]ubmit to mandatory registration and public notification of all current addresses with the Pennsylvania State Police" as a condition of having his or her transfer accepted under the Parole Compact. 61 Pa.Stat.Ann. Section 331.33(d)(3)(i). The Board's September 11, 1997 policy was further codified as part of the December 21, 1998 amendment to the PBPPL at Sections 331.33(d)(3)(ii) and (iii), which state that any out-of-state parolee or probationer convicted of a sexual offense shall be required to:

> but the rehabilitative value of such a move is often lost if the prisoner loses the supervision, advice, and assistance he would have received had he stayed in the state of his imprisonment, and the protection of the community to which he goes is threatened by the presence of a former criminal who has been left to work out his own destiny unassisted and uncontrolled.
>
> *Id.* Because the Compact clarified these uncertainties, once Congress consented to the creation of the Compact, it was quickly ratified by all 50 states, including Pennsylvania, which ratified it in 1937.
> (Footnote omitted).

10. "S–x." refers to an enumerated paragraph in the parties' jointly filed Stipulation of Facts (Doc. No. 12).

11. Prior to the adoption of the September 11, 1997 policy, out-of-state sexual offenders requesting a transfer of their probation to Pennsylvania under the Parole Compact generally agreed to the application of conditions that might be different in the sending state than in Pennsylvania and to registration under Megan's Law. S–40.

(ii) Provide a signed copy of the "Pennsylvania State Police Sexual Offender Registration Notification" form and the "Pennsylvania State Police Sexual Offender Registration" form to the receiving state.

(iii) Provide a signed copy of "Addendum to Application for Compact Services Agreement to Return" form to the receiving state.

61 Pa.Stat.Ann. Sections 331.33(d)(ii) and (iii).

Out-of-state offenders are addressed at a new section under the Amended Act, Section 9795.2(b). Section 9795.2(b)(1) provides that the Amended Act's registration requirements shall apply to those individuals who have an out-of-state conviction equivalent to an offense listed in the Amended Act or who have been required to register under another state's sexual offender statute. Act No. 2000–18 Section 9795.2(b)(1). Section 9795.2(b)(3) further provides that an out-of-state offender who is subject to registration and who is also "paroled to the Commonwealth pursuant to the [Parole Compact] shall, in addition to the requirements of [the Amended Act], be subject to the requirements of ... [Section 331.33 of the PBPPL]." Act No. 2000–18 Section 9795.2(b)(3).

In sum, out-of-state offenders are treated the same under the Amended Act as they were under the Original Act. Section 9795(c) of the Original Act was essentially moved to Section 331.33(d) of the PBPPL and the Board's September 11, 1997 policy has been codified there as well. In turn, Section 331.33(d) was incorporated into the Amended Act at Section 9795.2(b). Thus, although the rules have been reshuffled, the results are the same. All out-of-state sex offenders are still automatically subject to community notification.

### 4) In–State v. Out–of–State Offenders Under The Amended Act

Out-of-state offenders are treated differently than in-state offenders under the Amended Act. First, no in-state offender whose crime was committed prior to April 26, 1996 is subject to community notification. All out-of-state offenders, including Doe and others whose crimes were committed prior to April 26, 1996, are subjected to community notification.

Also, the Amended Act provides no process for determining whether an out-of-state offender's crime is even equivalent to a listed offense. In contrast, only those in-state offenders who have been convicted of a listed offense and who have also been adjudicated as meeting the definition of a sexually violent predator, as defined in the Amended Act, are subject to community notification.

Moreover, out-of-state offenders, as opposed to in-state offenders, are subjected to community notification without any process. In-state offenders must receive notice, counsel, a psychological assessment, and a court hearing, at which the state has the burden of proving by clear and convincing evidence that he or she is a sexually violent predator as defined in the Amended Act. Out-of-state offenders are instead automatically subject to community notification as a condition of their obtaining Pennsylvania residency under the Parole Compact regardless of the circumstances surrounding their offense, their criminal history, or any assessment as to his or her propensity for recidivism. Furthermore, there is no provision under the Amended Act authorizing or permitting judicial review of an out-of-state sex offender's challenge to community notification.[12]

---

**12.** As we describe in greater detail below, the defendants maintain that there is a procedure whereby a probationer can register a complaint with the Board regarding a condition of probation. We note that such a procedure, which apparently would proceed after the probationer has been subjected to community notification, does not approach the extensive process afforded in-state offenders before community notification and therefore, would not constitute similar treatment.

### B.  *John Doe*

Doe currently resides in Pennsylvania. S–1. Defendant William F. Ward is Chairman of the Board and is being sued in his official capacity. S–2. Paul J. Evanko has been substituted for defendant Jeffrey Miller. S–3. Mr. Evanko is the Commissioner of the State Police and is being sued in his official capacity. S–3.

In late 1995, Doe engaged in a sexual relationship with an underage 15 year old girl (hereinafter referred to as "Smith"). S–5. Doe was 32 years old at the time and was the coach of Smith's softball team. S–5. At the time, Doe resided in a state outside of Pennsylvania (hereinafter referred to a "State X"). S–5. Over a four month period, Doe and Smith engaged in oral sex and sexual intercourse on a regular basis in the rear of Doe's van in a shopping center parking lot, at Doe's residence, and at various motels. S–8. Smith became pregnant from the relationship and obtained an abortion. S–8. Doe accompanied Smith to, and paid for, the abortion. S–8.

Prior to their sexual relationship, Doe was aware that Smith had emotional problems relating to bulimia, that her parents' were divorced, and that her grandfather had sexually molested her by, in her words, "touch[ing] her private areas," when she was a child. S–6. Doe was also aware that the relationship was an illegal act and that it was a sex offense. S–5. But in Doe's words, "I loved her and she loved me," and "I followed my heart instead of my brain." S–6.

Doe left State X in April 1996 and returned to Pennsylvania because he felt the relationship was getting out of control with Smith's increased displays of affection and that he could get into serious trouble. S–6. In late 1996, a criminal complaint was filed against Doe by State X law enforcement authorities charging him with seven first degree felonies and one second degree felony in connection with his relationship with Smith. S–7. The police officer who investigated the case requested that one charge of "sexual battery upon a child under sixteen" be filed against Doe. S–7. Sexual battery is a first degree felony in State X. S–7.

Thereafter, Doe was advised by his mother that two individuals had come to her house looking for him. S–7. Based upon a subsequent conversation with Smith, Doe contacted an attorney. S–7. The attorney advised Doe that an arrest warrant had been issued for him. S–7. Upon advice of counsel, Doe voluntarily returned to State X, after having been advised that he could be extradited there if he did not return. S–7.

Doe negotiated a plea agreement with State X's prosecuting authorities whereby he pled guilty to four counts of lewd assault, a second degree felony, lesser included offense. S–8. On March 27, 1997, Doe was given a 90 day sentence in a county detention center and 10 years probation. S–9. Among the conditions of probation imposed was a requirement that Doe obtain psychological counseling and successfully complete treatment; that he have no contact with the victim; that he reimburse reasonable current and future therapy for the victim; and that he have no contact with minors under 18 years of age without supervision by an adult who is aware of his probation and the nature of the charges. S–9. Prior to this incident, Doe's criminal record consisted of one driving under the influence charge in 1984, for which he was required to pay a small fine and attend certain classes. S–4.

During the plea and sentencing, the court did not identify any aggravating circumstances warranting a longer sentence but did identify two mitigating factors to justify a downward departure from the pertinent sentencing guidelines, (1) a legitimate uncoerced plea bargain and (2) a victim that was a willing participant of the incident. S–10. At no time during the plea bargaining or during the sentencing did anyone mention Megan's Law to Doe. S–10.

On April 28, 1997, Doe applied for a transfer of supervision from State X to Pennsylvania pursuant to the Parole Compact. S–11. Doe indicated in the application that he would comply with the conditions of supervision as fixed by both State X and Pennsylvania. S–11. The application did not mention, however, public notification under Megan's Law. S–11. The Board later received information from State X which identified Doe as a sex offender on probation for a felony conviction and further identified the judgment of guilt and the conditions of probation. S–11.

The Board sent an investigation request to State X on or about June 9, 1997 asking State X to advise Doe to report to a Board district office within 24 hours of arrival and that Pennsylvania Megan's Law sex offender registration would be required. S–12. On June 13, 1997, Doe signed a "Special Conditions of Parole" form acknowledging the conditions of his parole being transferred to Pennsylvania including the requirement that he check with the police jurisdiction where he is traveling in order to comply with all state, county, municipal law and ordinances regarding criminal registration in the community that he was being given permission to visit. S–13.

The Megan's Law paperwork was completed on Doe on June 13, 1997, including the police registration paperwork. S–14. Doe complied with the probation officer's instructions and registered as a sex offender with the State Police.[13] S–14. Doe maintains that he was informed on this date that he would not be subject to public notification pursuant to Megan's Law because he was not a sexually violent predator, but that he was aware of the registration requirement under Megan's Law a day before he returned to Pennsylvania. S–14.

Doe also executed a "Conditions Governing Parole/Reparole" form on June 13, 1997 relating to the conditions governing his parole. S–16. The form contained preprinted language advising Doe of his right to submit a complaint in writing to the Board's district director and then to the Board's director of supervision if he believed his rights were being violated as a result of parole supervision. S–16. The Board has had a written policy since at least September 30, 1991 governing general and special conditions of parole and reparole. S–16. Appeals by a person on probation regarding a general or special condition of probation may be raised through this procedure. S–16. The form did not mention, however, community notification under Megan's Law. S–30.

The transfer of Doe's probation was approved on June 17, 1997. S–15. Since returning to Pennsylvania, Doe has lived and worked without incident. S–18. He has also complied with all conditions of his probation, including the condition that he obtain counseling and that he pay for Smith's therapy costs. S–17.

In May 1998, Doe made an inquiry to his probation officer as to whether Megan's Law was only applicable to first degree felons, rather than second degree felons. S–21. He was advised in writing by a Board employee that Megan's Law also applied to second degree felons. S–21.

On or about July 20, 1998, Doe received a letter from the Board dated June 26, 1998 which indicated that he was subject to community notification. S–25. Although the letter was dated June 26, 1998, the envelope was post marked July 16, 1998. Additionally, the address on the envelope was incorrect. S–26. Doe had notified his probation officer of the address change at the time. S–26.

Doe testified that he saw his probation officer on July 21, 1998 and asked about the June 26, 1998 letter. S–27. Doe testified that the officer did not really know what it meant and thought it was some kind of form letter. S–27. At that meet-

---

**13.** Doe has not objected to the registration requirement in this proceeding.

ing, Doe also signed another "Conditions Governing Parole/Reparole" form which again contained pre-printed language about the right to file a complaint about any condition of probation, but made no mention of community notification under Megan's Law. S–27, 30.

Doe contacted the State Police immediately after he received the June 26, 1998 letter indicating that he would be subject to community notification. S–28. The State Police advised Doe to look up the law. S–28. The June 26, 1998 letter was the only notice of community notification that was provided to Doe. S–29.

Doe was aware of and agreed to comply with all conditions of probation imposed by the receiving state when he applied to return to Pennsylvania. S–30. He also understood that if he did not so agree, his transfer of probation would not be accepted. S–30. Doe was also aware that he could appeal the imposition of any condition of probation and had done so in connection with another matter two months earlier in May 1998. S–30. However, Doe never submitted a complaint to the Board over the issue of community notification. S–22.

On July 27, 1998, a local police officer distributed public notification fliers to approximately 75 of Doe's neighbors. S–31. The fliers contained Doe's name, photograph and current address, which is that of a family member with whom he resided. Exhibits to Stipulation of Facts ("Stip.Exs.") (Doc. No. 13) (filed under seal) at Ex. W. The fliers were titled, in large bold letters, "MEGAN'S LAW." *Id.* Beneath the title was the following:

### OUT–OF–STATE OFFENDER COMMUNITY NOTIFI- CATION FLIER

This is to inform you that the below listed individual has been designated for Community Notification by the Pennsylvania Board of Probation and Parole, as outlined in Title 42, Judiciary and Judicial Procedure, of the Pennsylvania Consolidated Statutes, Chapter 97, Subchapter H, Registration of Sexual Offenders:

### COMMUNITY NOTIFICATION IS REQUIRED FOR THIS DESIGNATION

\*     \*     \*     \*     \*     \*

The subject was convicted of Pennsylvania Crimes Code Section or in the case of Out–of–State Offenders, the appropriate equivalent: [18 Pa.Cons.Stat.Ann. Section] 3125 [relating to aggravated indecent assault]

*Id.* The flier provides no additional information about Doe's offense.[14] *Id.*

The fliers were also distributed by the police officers to local schools, day care centers, and licensed preschool programs and made available to the general public. S–32, 33. The police officers' actions were in accordance with state law. S–32.

### II. *Analysis*[15]

█ Doe has looked exclusively to the U.S. Constitution for relief from communi-

---

14. The defendants point to what they consider an important distinction in the wording of the community notification flier issued for an individual designated a sexually violent predator and the community notification flier issued for an out-of-state sex offender. Specifically, the sexually violent predator flier uses the term "Sexually Violent Predator" at the top whereas the out-of-state offender community notification flier uses the terms "Megan's Law" and "Sexual Offender." There would be little difference in the stigma resulting from community notification by omitting the phrase "Sexually Violent Predator" and instead labeling one a "Megan's Law Sexual Offender." The public's knowledge of Megan's Law generally comes from the case involving a seven-year old New Jersey girl, Megan Kanka, who on October 31, 1994, was brutally raped and murdered by a twice-convicted sex offender who lived next door. We have little doubt that given this background, the public's perception of an individual labeled a Megan's Law Sexual Offender would be that of a dangerous child molester.

15. Summary judgment is mandated where the pleadings and evidence on file show there is no genuine dispute of material fact, and

ty notification. "However, it is well established that courts have a duty to avoid passing upon a constitutional question if the case may be disposed of on some other ground." *Spicer v. Hilton*, 618 F.2d 232, 239 (3d Cir.1980) (citations omitted). Without ruling on the constitutional issues raised by Doe, we find that the Compact requires Pennsylvania to provide Doe with the same process as is provided to in-state offenders before subjecting him to community notification.[16]

### A. *Jurisdiction*

■ We first address the threshold issue of jurisdiction. Federal courts lack subject matter jurisdiction to enjoin state officials on the basis of state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (Eleventh Amendment prohibits federal court from ordering state officials to conform their conduct to state law). A finding that the Parole Compact is federal law, therefore, is a jurisdictional prerequisite.

■ We have uncovered only one case, *Warner v. Parke*, 1996 WL 495040 (7th Cir. Aug.29, 1996), an unpublished opinion from the United States Court of Appeals for the Seventh Circuit, that has spoken on the federal/state law status of the interstate parole compact. The Seventh Circuit concluded in *Warner* that as an interstate compact approved by Congress, the interstate parole compact operates as both state and federal law. *Id.* at *3. Although the court cited to *Reed v. Farley*, 512 U.S.

339, 347, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994), the court provided no analysis for its conclusion.

The Supreme Court has never ruled on the issue of whether the interstate parole compact is federal law. In *Cuyler v. Adams*, 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981), however, the Court held that the Interstate Agreement on Detainers ("IAD"), a substantially similar interstate compact, is a federal law subject to federal court construction. The Court reaffirmed its holding in *Carchman v. Nash*, 473 U.S. 716, 719, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985) (The IAD "is a congressionally sanctioned interstate compact within the Compact Clause, U.S. Const., Art. I, Section 10, cl. 3, and thus is a federal law subject to federal court construction." (citing *Cuyler* )) and *Reed v. Farley*, 512 U.S. 339, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994) ("While the IAD is indeed state law, it is a law of the United States as well." (citing *Carchman* and *Cuyler* )).

The Court explained in *Cuyler* that an interstate compact is transformed into federal law when (1) it falls within the scope of the Constitution's Compact Clause, (2) it has received congressional consent, and (3) its subject matter is appropriate for congressional legislation. *Id.* at 439–40, 101 S.Ct. 703. The interstate parole compact satisfies each of these conditions.

First, the need to assert cross-border control of people subject to the jurisdiction of the criminal justice system, whether individuals with detainers or parolees, is a

---

that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

**16.** Doe did not assert a claim for relief pursuant to the Parole Compact as part of his complaint. In light of the strong preference for avoiding premature constitutional decisions, the court raised the issue sua sponte and requested additional briefs on the matter, which have now been submitted. *See Spicer*, 618 F.2d at 240–41 wherein the Court of Appeals for the Third Circuit observed that, [t]he compulsion to avoid premature constitutional decisions is so strong that this

court has previously held that it supersedes even our customary concern with orderly presentation on the issues.... That is also true where, as here, the nonconstitutional basis for the decision was neither raised in the pleadings nor ruled upon by the lower court. The Supreme Court has on several occasions even applied the doctrine when the nonconstitutional ground was not presented by the parties but was first noticed by the Court itself.

(Citations and quotation omitted).

matter that falls within the scope of the Constitution's Compact Clause. *See Cuyler*, 449 U.S. at 442, n. 10, 101 S.Ct. 703. Second, the interstate parole compact has received congressional consent. In fact, the legislative source of the congressional consent is the same for both the IAD and the interstate parole compact. *See* Compacts between States for the Cooperation in Prevention of Crime, 4 U.S.C. Section 112. Lastly, the subject matter is appropriate for congressional legislation, as the need for interstate cooperation to monitor and control parolees is the same as it is for inmates with detainers.

Accordingly, we hold that the Parole Compact, as a congressionally sanctioned interstate compact, is a federal law as well as state law. We further hold, therefore, that this court has subject matter jurisdiction to interpret and apply the Parole Compact.

## B. *Rules of Statutory Construction*

■ The defendants have steadfastly maintained that the Board had an unfettered right under the Parole Compact to reject Doe's transfer to Pennsylvania. We disagree.

The Parole Compact provides in pertinent part as follows:

Entered into by and among the contracting states, signatories hereto, with the consent of the Congress of the United States of America granted by an act, entitled 'An act granting the consent of Congress to any two or more states to enter into agreements or compacts for cooperative effort and mutual assistance in the prevention of crime and for other purposes.'

The contracting states solemnly agree:

(1) That it shall be competent for the duly constituted judicial and administrative authorities of a state party to this compact (herein called the 'sending state') to permit any person, convicted of an offense within such state and placed on probation or released on parole, to reside in any other state party to this compact (herein called 'receiving state') while on probation or parole, if—

(a) Such person is in fact a resident of or has family residing within the receiving state and can obtain employment there.

(b) Though not a resident of the receiving state and not having his family residing there, the receiving state consents to such person being there.

Before granting such permission, opportunity shall be granted to the receiving state to investigate the home and prospective employment of such person.

A resident of the receiving state, within the meaning of this section, is one who has been an actual inhabitant of such state continuously for more than one year prior to his coming to the sending state, and has not resided within the sending state more than six continuous months immediately preceding the commission of the offense for which he has been convicted.

(2) That each receiving state will assume the duties of visitation of, and supervision over, probationers or parolees of any sending state, and, in the exercise of those duties, **will be governed by the same standards that prevail for its own probationers and parolees.**

61 Pa.Stat.Ann. Section 321 (emphasis added).

The plain language of the Parole Compact indicates that the authority to approve a probationer's move to a receiving state lies solely with the sending state if, like Doe[17], the probationer meets the requirements outlined in subsection (1)(a)—i.e., the probationer is either a resident of the receiving state or has family residing there and he or she can obtain employment there. *See United States v. Gollapudi*, 130 F.3d 66, 70 (3d Cir.1997) ("In inter-

---

17. *See* Stip.Exs. at Ex. Z–1, p. 20.

preting a statute, the starting point is the language of the statute itself.... '[O]nly the most extraordinary showing of contrary intentions' in the legislative history will justify a departure from that language." (Citations and quotation omitted)). If neither the residency nor family residency requirements of subsection (1)(a) are satisfied, subsection (1)(b) provides that the sending state may permit a transfer only upon the receiving state's consent. If the requirements of subsection (1)(a) are not met, therefore, the authority to approve of a probationer's move to a receiving state is shared as between the sending state and receiving state.

The Parole Compact next provides that a receiving state *"will assume* the duties of visitation of and supervision over" the probationer from the sending state and that "in the exercise of those duties, *will be governed by the same standards* that prevail for its own probationers and parolees". 61 Pa.Stat.Ann. Section 321(2) (emphasis added). Thus, once a sending state grants permission pursuant to either subsection (1)(a) or (b), the receiving state must assume supervision over the probationer and treat him or her the same as instate offenders.

This interpretation is consistent with the "fundamental rule of construction [ ] that effect must be given to every part of a statute or regulation, so that no part will be meaningless." *Sekula v. Federal Deposit Ins. Corp.*, 39 F.3d 448, 454 (3d Cir. 1994). If, for example, a receiving state's consent to a transfer were always required, as the defendants argue, subsec-

tion (1)(a) of the Parole Compact would be meaningless.

The regulations promulgated by the Parole and Probation Compact Administrators' Association (the "Administrators' Association") [18] also supports our reading of the statute. *See e.g., ALM Corp. v. United States Environmental Protection Agency, Region II*, 974 F.2d 380, 383 (3d Cir. 1992) (judicial deference is given to agency's reasonable interpretation of a statute that it administers whether it is interpreting statute directly or through the promulgation of a rule or regulation, so long as such interpretation does not conflict with the plain language of the statute). Section 3–106 of the regulations provides that:

> No state shall refuse to supervise a parolee or probationer eligible under the Compact who has the necessary employment and residency qualifications....

Compact for the Supervision of Parolees and Probationers Manual ("Regulations Manual"), Section 3–106 (1999). Moreover, as a participant in the Association, Pennsylvania would be bound by the Association's regulations. *See Aveline*, 729 A.2d at 1258 (finding that Pennsylvania may be bound by the Association's regulations if a member but unable to determine whether Pennsylvania was a member); *see e.g., First Liberty Investment Group v. Nicholsberg*, 145 F.3d 647, 650 (3d Cir. 1998) (member of self-regulating association is bound by association's regulations).

We note that the defendants contend that the term "standards" in Section 321(2) is different from what they term is a "condition" of probation at Section 331.33(d)(3) (requirement that every out-of-state sex

---

18. In the interest of uniform application and interpretation, Section (5) of the Parole Compact provides a mechanism for the issuance of rules and regulations for uniform administration, stating:

> That the governor of each state may designate an officer who, acting jointly with like officers of other contracting states, if and when appointed, shall promulgate such rules and regulations as may be deemed necessary to more effectively carry out the terms of this compact.

61 Pa.Stat.Ann. Section 321(5); *Aveline*, 729 A.2d at 1258. The Administrators' Association was created pursuant to this provision which consists of designated officers from each state who promulgate rules and regulations for the uniform application of the Parole Compact. Compact for the Supervision of Parolees and Probationers Manual, Section 1.7 (1999); *Aveline*, 729 A.2d at 1258.

offender submit to community notification). The defendants maintain that the Administrators' Association's regulations support the notion that these are distinct terms because (1) the regulations clearly contemplate that a receiving state may impose special conditions on parole and (2) standards of supervision are addressed at Section 400, the commentary to which indicates that what is meant by "same standards" language in Section 321(2) is that a receiving state not provide a lesser level of service for out-of-state cases than it does for its own cases. The defendants argue, therefore, that the requirement that every out-of-state sex offender submit to community notification without any process, even though in-state offenders must be accorded extensive process, does not conflict with Section 321(2) because such requirement is a "condition" of probation not a "standard."

Other than the reference to the Administrators' Association's regulations, the defendants offer little analysis in support of their position. We have reviewed the regulations and fail to see the illuminating distinction urged upon us.

Even so, we note that in common parlance a "condition" is defined as a "prerequisite ... a restricting or modifying factor." Merriam–Webster's Collegiate Dictionary at 240 (10th ed.1999). A "standard" is defined as a "criterion ... something set up and established by authority as a rule for the measure of quantity, weight, extent, value, or quality." *Id.* at 1145. Any distinction that can be drawn from these definitions does not change our

analysis. Indeed, so defined, these terms do not contrast with the defendants' notion that the regulations contemplate that a receiving state may impose a special condition of parole. If a receiving state intends to impose mandatory community notification as a special "condition" on an out-of-state sex offender, such as Doe, it may, but it must first apply the same "standards," or measuring criterion, as is used for in-state offenders when doing so, i.e., a court hearing. As the defendants point out, the Administrators' Association's regulations contemplate that a receiving state shall not provide a lesser level of service for out-of-state cases than it does for its own cases.[19]

### C. *Conflicting Statutes*

■ As previously noted, Section 331.33(d)(3) of the PBPPL requires every out-of-state probationer convicted of a sex offense to submit to community notification as a prerequisite to the acceptance of such probationer's transfer under the Parole Compact. 61 Pa.Stat.Ann. Section 331.33(d)(3). Section 331.33(d)(3) essentially changes the terms of the Parole Compact as it places additional conditions on the transfer of parolees and probationers who, like Doe, satisfy the residency and employment requirements of subsection (1)(a) of the Parole Compact.

■ An interstate compact functions as a contract and "takes precedence over statutory law in member states." *McComb v. Wambaugh,* 934 F.2d 474, 479 (3d Cir.1991); *see* Regulations Manual Commentary to Section 1–101 ("The law of

---

**19.** The defendants requested in their brief an opportunity to submit supporting affidavits "[i]f the court remains uncertain about the distinction between standards and conditions." Defs' Br. Regarding Interstate Compact (Doc. No. 27) p. 9, n. 3. In the context of statutory interpretation, the court looks to the language of the statute. *See Gollapudi,* 130 F.3d at 70. The court, not the defendants, make the determination as to what meaning should be ascribed to that language. We recognize that deference is generally given to an agency's interpretation of a statute that it administers, so long as such interpretation does not conflict with the plain language of the statute. Thus, any rule or regulation issued by the Administrators' Association, the body charged with the responsibility of promulgating rules and regulations for use in the administration of the Parole Compact, regarding the meaning of "standards" could be helpful to the court. A sworn statement by the defendants as to what they think certain language in the statute means, however, would not be at all important.

interstate compacts as interpreted by the U.S. Supreme Court is clear that interstate compacts are the highest form of state statutory law, having precedence over conflicting state statutes....") "Having entered into a contract, a participant state may not unilaterally change its terms."[20] *Id.* Under the facts of the instant case, therefore, Section 331.33(d)(3) is superseded by the Parole Compact.

▪ We note that uniformity of interpretation is important in the construction of a compact. *See McComb,* 934 F.2d at 479. Thus, we searched both federal and state appellant case law for any case where the Parole Compact had been interpreted under facts similar to the instant case. We found no such case.

We also searched state statutory law to determine whether any other state has, like Pennsylvania, placed extraneous conditions on the acceptance of out-of-state offenders under the Parole Compact. We are aware of only two other states, Illinois and Tennessee, that have statutes which place specific conditions on the acceptance of transfers under the Parole Compact. The additional conditions in these states, however, do not appear to infringe upon the Parole Compact.

Illinois requires, for example, that all out-of-state sex offenders submit a blood specimen for genetic marker grouping as a condition of having his or her transfer accepted under the Parole Compact. 730 Ill.Comp.Stat. Section 5/5-4-3(a)(5). Illinois also requires, however, that all in-state sex offenders submit a blood specimen. 730 Ill.Comp.Stat. Section 5/5-4-3(a)(1) and (3). Because the Parole Compact requires a receiving state to apply the same standards to transferees that prevail

for its own probationers and parolees, Illinois has merely imposed as a condition of acceptance a requirement that an out-of-state sex offender would have to comply with anyway, once he or she transfers to the state. Thus, we doubt that such a condition would be regarded as an invalid infringement upon the Parole Compact's non-discretionary transfer provision, i.e. residency and employment in the receiving state.

Tennessee, like Illinois, imposes a condition on the acceptance of out-of-state sex offenders under the Parole Compact that is also a requirement imposed upon in-state sex offenders. *See* Tenn.Code Ann. Sections 40–28–409 and 40–35–21 (requiring the submission of DNA sample). Again, we doubt that such a condition would run afoul of the Parole Compact's non-discretionary transfer provision.

In sum, we have found nothing in the case law or state statutory law which would suggest uniform acceptance of a state having the authority to, as Pennsylvania has done, unilaterally modify the terms of the Parole Compact.

D. *Sending State's Authority and Waiver*

The defendants also contend that under the Parole Compact, a sending state is not required to grant permission to a probationer who, like Doe, satisfies the residency and employment requirements and suggests that Pennsylvania could request State X to have Doe returned. We do not disagree that under the terms of the Parole Compact a sending state has the discretion to deny a probationer's request for a transfer even if the probationer satisfies

---

**20.** *See also Aveline,* 729 A.2d at 1257 n. 10 observed that,

[c]ompacts have the characteristics of contracts because the enactment of the compact terms as part of an enabling statute by one state is viewed as an offer. The offer may be accepted through the enactment of statutes, including the same compact terms by another state. As with other contracts,

the Contract Clause of the United States Constitution protects compacts from impairment by the states. This means that upon enacting a compact, it takes precedence over the subsequent statutes of signatory states and, as such, a state may not unilaterally nullify, revoke or amend one of its compacts if the compact does not so provide." (Internal citations omitted).

the residency and employment requirements in a receiving state. Also, it may be that a receiving state could request a sending state to agree to mandatory submission to community notification without any process as a condition of approving a probationer's transfer. What the Parole Compact does prohibit, however, is a receiving state unilaterally imposing such a condition, as Pennsylvania has done at 61 Pa.Stat.Ann. Section 331.33(d)(3). Otherwise, a state, such as Pennsylvania, could stifle the transfer of probationers and parolees among the states and unfairly filter out those individuals that it deems undesirable.

In the instant case, for example, State X does not have a statute similar to Section 331.33(d)(3). Thus, although State X would be required to accept Pennsylvania's sex offenders, Pennsylvania could end up with no State X sex offenders, as it is unlikely a sex offender in State X would seek a transfer to Pennsylvania knowing that he or she will automatically be subjected to community notification without any process. One can only assume that this is the very type of situation the states sought to avoid with the enactment of the Parole Compact.

As to the defendants' suggestion that Pennsylvania could seek the return of Doe to State X, we question State X's eagerness to comply with such request absent a reciprocal agreement in relation to Pennsylvania sex offenders seeking a transfer to State X. The consummation of such side agreements could, in the end, halt the transfer of sex offenders between the states and undermine the essence of the Parole Compact.

■ On a final note, the defendants argue that Doe waived the process accorded in-state offenders prior to community notification when applying for a transfer, as he agreed to comply with the conditions of the receiving state in the transfer application. We disagree.

Doe's transfer application is not sufficiently detailed to effectuate such a waiver. The proviso acknowledging an agreement to comply with the receiving state's conditions of probation is written in general terms. Stip Exs. at Ex. H. There is no mention of mandatory submission to community notification. *Id.*

Also, a receiving state's obligation under the Parole Compact to apply the same standards to in-state and out-of-state probationers and parolees runs directly to member states. Thus, we doubt Doe's authority to waive that obligation.

### III. *Conclusion*

After reviewing the parties' submissions, we find that there are no genuine disputes of material fact and that Doe is entitled to judgment as a matter of law. Although Doe raised numerous constitutional issues in support of his motion, we find that this case may be disposed of on other grounds—the plain language of the Parole Compact. Without ruling on the constitutional issues, we hold, based on a plain reading of the Parole Compact, that the Board did not have the authority under the facts of this case to either reject or place the extraneous condition of community notification on Doe's move to Pennsylvania and that Doe must be provided with the same process as is provided to in-state sex offenders before subjected him to community notification.

Accordingly, the defendants' motion for summary judgment will be denied and Doe's motion for summary judgment will be granted. Therefore, Doe's request for injunctive relief will be granted.