**Orville LINES, Plaintiff,**

v.

**David WARGO, et al., Defendants.**

**Civil Action No. 99–379.**

United States District Court, W.D. Pennsylvania.

Jan. 10, 2003.

---

Witold J. Walczak, ACLF of PA, Pittsburgh, PA, for plaintiff.

Seth A. Mendelsohn, Office of Attorney General, Bureau of Consumer Protection, Harrisburg, PA, for defendants.

### MEMORANDUM ORDER

McLAUGHLIN, District Judge.

On December 6, 1999, Plaintiff Orville Lines, acting *pro se*, filed the instant action. This matter was assigned to United States District Judge Sean J. McLaughlin and was referred to United States Magistrate Judge Susan Paradise Baxter for report and recommendation in accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1), and Rules 72.1.3 and 72.1.4 of the Local Rules for Magistrates.

Plaintiff is an out-of-state sexual offender who transferred his parole to Pennsylvania. Plaintiff brings this action under 42 U.S.C. § 1983 challenging his subjection to the community notification provisions of Pennsylvania's Megan's Law and alleging that his rights to due process and equal protection have been violated by the statute. As relief, Plaintiff seeks compensatory and punitive damages as well as a declaratory judgment and injunctive relief. [Doc. No. 7, p. 4.]

Defendant Wargo moved for summary judgment claiming that Plaintiff's Fourteenth Amendment rights were not violated and that, alternatively, Defendant is entitled to qualified immunity. Through newly obtained counsel, Plaintiff filed a brief in opposition to the motion for summary judgment, raising for the first time the applicability of Pennsylvania's Interstate Compact Concerning Parole (the "Parole Compact"), PA. STAT. ANN. tit. 61, § 321 (West 1999), and *Doe v. Ward*, 124 F.Supp.2d 900 (W.D.Pa.2000) (holding that the community notification provisions of Pennsylvania's Megan's Law as applied to out-of-state offenders violate the Parole Compact). On August 5, 2002, Magistrate Judge Baxter heard oral argument from the parties on the pending summary judgment motion.

On August 30, 2002, Magistrate Judge Baxter issued a Report and Recommendation finding, in part, that the disparate treatment of out-of-state offenders under Pennsylvania's Megan's Law violated the Parole Compact. Nevertheless, though the subject of the Parole Compact had been briefed by Plaintiff and addressed by both parties at the oral argument, the issue of whether there was an implied cause of action (and therefore, an implied remedy) under the Compact had not been briefed or argued and was brought up by the Court *sua sponte* in the Report and

Recommendation. Magistrate Judge Baxter concluded that, despite the apparent conflict between Pennsylvania's Megan's Law and the Parole Compact, Plaintiff could not maintain a private cause of action to enforce the Compact's provisions.

Further, the Report and Recommendation found that Plaintiff's rights to equal protection and procedural due process as guaranteed by the Fourteenth Amendment were violated. The Report concluded by finding that Defendant was entitled to qualified immunity because he acted in accordance with an apparently valid statute.

Plaintiff's counsel has filed Objections to the Report and Recommendation, asserting that (1) the Court erred in concluding that the Interstate Compact of Probation and Parole does not create a federal right enforceable through § 1983, and (2) the Court erred in concluding that Defendant was entitled to qualified immunity. Additionally, the Objections note that Plaintiff's original prayer for injunctive and declaratory relief remains pending as it was not addressed in the Report and Recommendation. [Doc. No. 31.]

Defendant filed no Objections to the Report and Recommendation, but has filed a Reply to Plaintiff's Objections. Defendant responds to Plaintiff's arguments on the implied cause of action and qualified immunity. He also disputes the contention that the declaratory and injunctive relief components of the original prayer for relief remain pending in this case. Defendant argues that such relief is now moot because "there is no basis to assume that Plaintiff will again be subjected to community notification by this trooper." [Doc. No. 32.]

We now consider these matters *de novo.* *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b). Initially, however, we digress briefly to clarify the relevant statutory provisions which are presently at issue.

**Factual and Legal Background[1]**

Plaintiff is a convicted sex offender who received a sentence of 20 years imprisonment by a Maryland Court following his conviction on a charge of second degree rape. After serving approximately 10 and ½ years of his jail sentence, he was paroled. The terms of his parole in Maryland did not require him to be subjected to community notification. Pursuant to the Parole Compact, Plaintiff's parole was transferred to Pennsylvania so that Plaintiff could reside near his mother in Oil City, Pennsylvania.

In the meantime, Pennsylvania's Megan's Law was signed into law on October 24, 1995. In general the statute, as amended in 1996, *see* Pub.L. 300, No. 46, § 2 (May 22, 1996) (hereinafter referred to as "Megan's Law I"), required (1) registration with the Pennsylvania State Police by individuals convicted of certain enumerated sexual offenses, and (2) community notification for those sexual offenders who were deemed to be "sexually violent predators" within the meaning of the Act. *See generally* 42 Pa.C.S.A. §§ 9791–9799.6 (West 1998). With regard to those individuals convicted of sexually violent offenses under Pennsylvania law, the statute provided for specific procedures whereby a sexual offender would be evaluated for the purpose of determining, prior to sentencing, whether he/she was considered a "sexually violent predator." *See id.* at § 9794. These procedures included an initial mandatory assessment by a state board, followed by a hearing before the

---

1. Although the record in this case was never fully developed and the Magistrate Judge treated Defendant's summary judgment as a motion for judgment on the pleadings under Fed.R.Civ.P. 12(c), the following facts have not been disputed.

original trial court, at which time the court would consider the board's assessment and the defendant would have the right to be represented by legal counsel and the opportunity to present evidence and/or cross-examine any witnesses produced by the Commonwealth. *Id.* at § 9794(c)-(e). If the defendant had been convicted of certain enumerated offenses, then he/she was presumed by both the board and the court to be a sexually violent predator; the defendant faced the burden of rebutting this presumption by presenting clear and convincing evidence to the contrary. *Id.* at § 9794(b). Once assessed as a "sexually violent predator," a defendant would be subject to community notification, meaning that the local law enforcement agency would advise certain persons and agencies within the community of defendant's presence in the community, including the defendant's identity, photograph, residence, the nature of his offense, and a statement that he had been designated by court order as a sexually violent predator. *Id.* at § 9798(a)-(b). In addition to the community notification requirements, persons designated "sexually violent predators" under Megan's Law I faced a mandatory maximum penalty of life imprisonment for their predicate offenses and a mandatory sentence of life imprisonment if convicted of a subsequent sexually violent offense. *Id.* at §§ 9799.4(a) and (c)-(d).

At the time of Plaintiff's transfer to this Commonwealth, Pennsylvania's Megan's Law I also contained the following provision concerning out-of-state sexual offenders:

> **(c) Offenders from other states.**—As a condition of obtaining residency in Pennsylvania under the interstate compact for the supervision of parolees and probations, sexual offenders from other states shall be required to register and abide by the requirements of this subchapter and, where the Pennsylvania Board of Probation and Parole deter-

mines it is necessary to protect the public, shall submit to public notification as provided in section 9798 (relating to other notification).

42 PA.C.S.A. § 9795(c) (West 1998). The Pennsylvania Board of Probation and Parole had adopted a policy at that time requiring community notification in all out-of-state parole supervision cases involving sex offenders such as Plaintiff, though it did not officially require that such persons be specifically identified as sexually violent predators.

Plaintiff was ultimately released from custody on or about November 28, 1996. The day after his release Plaintiff complied with the registration requirements of Pennsylvania's Megan's Law, 42 PA.C.S.A. § 9793 (West 1998), and reported his then current address and telephone number to law enforcement authorities.

By letter dated December 4, 1997, Captain Ernest R. Spittler, Director of Records and Identification Division of the Pennsylvania State Police Headquarters in Harrisburg, Pennsylvania advised the State Police Barracks in Seneca, Pennsylvania that Plaintiff was an individual residing within that jurisdiction and met the criteria of an "out-of-state offender" as determined by the Parole Board. Sargent Beggs, Crime Unit Supervisor of the Seneca Barracks, received the correspondence on or about December 8, 1997 along with several reproduction-ready copies of a "Megan's Law Out–Of–State Offender Community Notification Flier" which included Plaintiff's photograph, full name and current address. In addition, the flier contained the following language:

> This is to inform you that the below listed individual has been designated for "Community Notification" by the Pennsylvania Board of Probation and Parole outlined in title 42, Judiciary and Judicial Procedure, of the Pennsylvania

Consolidated Statutes, Chapter 97, Subchapter H, Sexually Violent Offenders, pursuant to Subsection 9795(c)[.]

* * *

The subject was convicted of Pennsylvania Crimes Code Section: 3121 or in the case of Out–of–State Offenders, the appropriate equivalent.

* * * COMMUNITY NOTIFICATION IS REQUIRED FOR THIS DESIGNATION* * *

(See Ex. B to Declaration of David Wargo, Def.'s Mot. for Summ. Judg. [Doc. No. 17].) Sargent Beggs was further advised that the community notification must be accomplished within 72 hours of receipt of the correspondence, consistent with 42 PA. C.S.A. § 9798(c) (West 1998).

Accordingly, Sargent Beggs instructed Trooper Swatzler[2] and Defendant Wargo to make the required community notifications. On December 8 and 10, 1997, in accordance with the notification procedures of Megan's law, Defendant Wargo distributed copies of the flier to various local schools, law enforcement agencies, and neighbors of Plaintiff.

In late 1998, subsequent to the conduct which forms the basis of this lawsuit, the Pennsylvania Legislature enacted Act 1998–171. This Act amended PA. STAT. ANN. tit. 61, § 331.33 (West 1999) so as to add a new provision *mandating* community notification in all cases involving out-of-state sexual offenders under supervision in Pennsylvania pursuant to the Parole Compact. See id. at § 331.33(d)(3) as amended by Pub.L. 1298, No. 171, § 1 (Dec. 21, 1998). In addition, in May of 2000 the Pennsylvania Legislature enacted comprehensive amendments to Megan's Law ("Megan's Law II") which, in relevant part, deleted former 42 PA.C.S.A. § 9795(c) and made public notification mandatory for out-of-state sexual offenders paroled in Pennsylvania pursuant to PA. STAT. ANN. tit. 61, § 331.33. See 42 PA.C.S.A. § 9798(e) (West.Supp.2002), as amended by Pub.L. 74, No. 18 § 3 (May 10, 2000). Megan's Law II also substantially revised the procedures whereby in-state offenders are evaluated "sexually violent predator" status.[3]

This case originally came on as a *pro se* § 1983 action challenging the Plaintiff's subjection to community notification under Pennsylvania's Megan's Law and alleging various violations of Plaintiff's constitutional rights as a result thereof. Plaintiff subsequently obtained counsel and filed a counseled response to the Defendant's motion for summary judgment, in which he refined his constitutional challenges, pursuing more specifically the equal protection and due process arguments addressed by Magistrate Judge Baxter's Report and Recommendation. In so doing, however, Plaintiff directed his constitutional claims at the community notification and out-of-state offender provisions in Megan's Law II and PA. STAT. ANN. tit. 61, § 331.33 (West

---

**2.** For reasons unknown to the Court, Trooper Swatzler was not named as a Defendant in this action.

**3.** In *Commonwealth v. Williams,* 557 Pa. 285, 733 A.2d 593 (1999), the Pennsylvania Supreme Court had struck down those provisions of Megan's Law I relating to "sexually violent predators" on the ground that the procedure whereby the "sexually violent predator" designation was made violated federal due process principles. *See id.* 733 A.2d at 602–03, 607–08. In particular, the Court found that former § 9794(b) was unconstitutional in that it impermissibly shifted to the defendant the burden of rebutting the presumption that he/she is a sexually violent predator once convicted of certain enumerated offenses. 733 A.2d at 602–03. The May 2000 amendments to Megan's Law were primarily aimed at curing this constitutional deficiency. Accordingly, under Megan's Law II, the prosecution bears the burden of establishing by clear and convincing evidence a defendant's status as a sexually violent predator. *See* 42 Pa.C.S.A. § 9795.4(e).

1999), *as amended,* both of which are technically irrelevant in that they post-date the conduct which forms the basis of Plaintiff's complaint. Because this discrepancy was never brought to the Magistrate Judge's attention, the litigation proceeded along these lines at oral argument as well. Therefore Magistrate Judge Baxter's opinion analyzes Plaintiff's due process and equal protection claims in terms of § 331.33 and Megan's Law II, rather than the provisions outlined above which were in effect at the time of Defendant Wargo's conduct.

Notwithstanding this discrepancy, this Court has considered the Report and Recommendation, as well as the Plaintiff's objections thereto, in the context of the applicable provisions of Megan's Law I. Ultimately, the constitutional arguments raised by the parties were sufficiently joined such that this Court can conduct a meaningful *de novo* review of the Magistrate's analysis and conclusions in the light of the applicable statutory law. In addition, Megan's Law I and II are similar in an important respect: they both provide some procedural mechanism whereby a defendant convicted of a sexually violent offense *within the Commonwealth* could challenge his status as a "sexually violent predator," and therefore avoid the resultant consequences of community notification. No such provisions appear in either Megan's Law I or II with respect to out-of-state offenders insofar as their subjection to community notification is concerned.

On the other hand, the Court notes one important distinction between Megan's Law I and II as it concerns Plaintiff's constitutional claims: Megan's Law II by its terms mandates community notification for out-of-state sexual offenders,[4] whereas Megan's Law I on its face did not.[5] To the extent that Plaintiff's constitutional claims are premised on a facial attack on the Pennsylvania statute, the distinction is significant, particularly insofar as the defense of qualified immunity is concerned. (*See* the Court's discussion, *infra.*) Technically speaking, Megan's Law I did not mandate community notification for out-of-state sexual offenders, but instead gave discretion to the Pennsylvania Parole Board to determine whether such public notification was appropriate in light of public safety concerns. We have accepted the Defendant's representation that, at the time of Wargo's conduct, the Parole Board had a policy of requiring all out-of-state sexual offenders to submit to community notification; therefore, as a practical matter, Plaintiff was subjected to community notification, premised solely on his status as an out-of-state sexual offender, pursuant to either an official or *de facto* governmental policy.[6] We therefore construe Plaintiff's constitu-

4. *See* 42 PA.C.S.A. § 9798(e) (West Supp. 2002); PA. STAT. ANN., tit. 61, § 331.33 (West 1999).

5. *See* 42 Pa.C.S.A. § 9795(c) (West 1998).

6. Defendant has asserted that, although the Parole Board required public notification for all out-of-state sexual offenders, it did not require that such persons be identified as sexually violent predators. Accepting this as true (particularly since it is unrebutted by the Plaintiff), we conclude that it does not make a difference to the outcome of this case. Having reviewed the official community notice flier that was distributed by Defendant Wargo, the Court is of the view that there are sufficiently strong implications of Plaintiff's status as a "sexually violent predator" such that members of the community could easily have been misled in this regard. Thus, the fact that the Parole Board did not officially brand Plaintiff *a sexually violent predator is* irrelevant, given that the flier essentially does so. Regardless, however, even the public dissemination of accurate information concerning Plaintiff's past convictions implicates state protected privacy and reputation interests which, in turn, implicate due process concerns.

tional claims as challenges to Megan's Law I, *as applied* to him. The Court finds this approach to be in the best interests of justice, given the fact that Plaintiff fairly raised his constitutional challenges in his *pro se* complaint, the issues have been sufficiently joined by both parties, the essential facts are not in dispute, the arguments are basically legal in nature, and the Court's constitutional analysis is largely the same as that undertaken by the Magistrate Judge.

**The Interstate Compact Concerning Parole**

 Plaintiff's first objection is that the Magistrate Judge erred in concluding that the Parole Compact does not create a federal right enforceable through 42 U.S.C. § 1983. In *Gonzaga University v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), the Supreme Court clarified that nothing short of a right "unambiguously conferred" by Congress would support a cause of action under § 1983. 536 U.S. at 282–83, 122 S.Ct. at 2275. Regardless whether a plaintiff is seeking to enforce a federal statutory right through a private cause of action implicit in the statute itself or through § 1983, there must first be a determination that "Congress *intended to create a federal right.*" *Id.* (emphasis supplied). Furthermore, "[f]or a statute to create such private rights, its text must be 'phrased in terms of the persons benefitted.'" *Id.* (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692 n. 13, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)). Where there is no indication from the text and structure of a statute that Congress intended to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action. 536 U.S. at 286–87, 122 S.Ct. at 2277.

For the reasons set forth by Magistrate Judge Baxter in her Report and Recommendation, we agree that the Parole Compact manifests no Congressional intent to create a federal right or remedy. Because we discern no intent by Congress to confer a new individual right on parolees like Plaintiff, § 1983 does not supply a viable cause of action for claims premised upon a violation of the Parole Compact. *See Gonzaga University*, 536 U.S. at 285, 122 S.Ct. at 2276 (Section 1983 merely provides a mechanism for enforcing individual rights secured elsewhere; therefore, one cannot go into court and claim a violation of § 1983 because " § 1983 by itself does not protect anyone against anything") (citations omitted).

Plaintiff likens the Parole Compact to the Interstate Agreement on Detainers Act ("IADA"), 18 U.S.C.A.App. § 2, which—according to Plaintiff—has been "routinely held to create federal rights enforceable by the group of individuals its provisions benefit." (Pl.'s Obj. to Rep. and Recommendation [Doc. No. 31] at p. 4.) The Court has examined *Alabama v. Bozeman*, 533 U.S. 146, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001) and *Yellen v. Cooper*, 828 F.2d 1471 (10th Cir.1987), both of which are cited by Plaintiff and involved application of the IADA; however, we find these cases to be inapposite to the case at bar and, therefore, not persuasive. In *Alabama v. Bozeman*, the Supreme Court considered a criminal defendant's challenge to his underlying state court conviction based on a violation of a provision of the IADA. 533 U.S. at 148–49, 121 S.Ct. 2079. Under Article IV(e) of the IADA, the State of Alabama—having lodged a detainer against Bozeman (a federal prisoner) and secured his presence for purposes of prosecuting state firearms charges—was prohibited from returning Bozeman to federal custody before the state trial was completed. *See generally id.* at 151–53, 121 S.Ct. 2079. Although the express language of Article IV(e) required the dismissal of Bozeman's charges with prejudice as a result of the State's

violation, Bozeman had nevertheless been tried and convicted in Alabama state court, the state court having rejected his motion to dismiss the case. *See id.* The Supreme Court affirmed the Alabama Supreme Court's ruling dismissing the underlying charges. *Id.* at 149, 121 S.Ct. 2079. Because the procedural posture of the case involved Bozeman's challenge to his underlying criminal conviction, the Court had no occasion to discuss whether Congress intended to create any new federal rights or—for that matter—any private right of action under the IADA.

Plaintiff's reliance on *Yellen* is similarly misplaced. In that case, a Colorado state prisoner (Seth Yellen) had been transferred pursuant to Article IV of the IADA to stand trial for armed robbery and related charges in Michigan. Following his conviction on those charges, Yellen later filed a § 1983 claim asserting that his federal rights to due process and equal protection had been violated by virtue of the failure by Colorado officials to inform him of certain pre-transfer rights [7] which were afforded him under the Uniform Criminal Extradition Act and extended under the IADA.[8] 828 F.2d at 1473–74. The Tenth Circuit affirmed the trial judge's dismissal of the complaint on the grounds that Yellen had waived his pretransfer rights by requesting a speedy trial on Michigan charges. *Id.* at 1473–74. However, the *Yellen* Court did not specifically analyze the IADA, or the creation of statutory rights or remedies thereunder, in light of the principles set forth in *Cort v. Ash* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) and subsequent Supreme Court pronouncements. Moreover, although the plaintiff in *Yellen* brought suit under § 1983, his underlying complaint was premised upon the violation of federal constitutional—not statutory—rights. Thus, *Yellen* in no way supports the proposition that Congress intended to confer individual rights to parolees under the Parole Compact.

Finally, having reviewed the language of the IADA, the Court finds that statute to be materially distinguishable from the Parole Compact such that no meaningful comparison can be made between the two. While the IADA bespeaks certain rights afforded to prisoners subject to the Act,[9]

---

**7.** These rights included the right to a pretransfer hearing, the right to the appointment of counsel, the right to seek a writ of habeas corpus, and the right to petition the governor of Colorado to stop the transfer.

**8.** In *Cuyler v. Adams*, 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981), the Supreme Court held that the rights afforded to prisoners under the Extradition Act are preserved by the IADA for prisoners being transferred against their will pursuant to Article IV of the IADA.

**9.** *See, e.g.*, IADA, Art. III(a) ("Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party State, and whenever during the continuance of the term of imprisonment there is pending in any other party State any untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred and eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court ... written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information, or complaint ..."); *Id.* at Art. III(d) ("Any request for final disposition made by a prisoner pursuant to paragraph (a) hereof shall operate as a request for final disposition of all untried indictments, informations, or complaints on the basis of which detainers have been lodged against the prisoner from the State to whose prosecuting official the request for final disposition is specifically directed.... If trial is not had on any indictment, information, or complaint contemplated hereby prior to the return of the prisoner to the original place of imprisonment, such indictment, information, or complaint shall not be of any further force or effect, and the court

the Parole Compact speaks only of the obligations among the States. Accordingly, having reviewed the matter *de novo*, this Court concurs with Magistrate Judge Baxter's recommendation that no private rights or remedies are afforded Plaintiff under the Parole Compact.

**Qualified Immunity**

Plaintiff also objects to the Magistrate Judge's conclusion that Defendant Wargo is entitled to qualified immunity. In her Report and Recommendation, Magistrate Judge Baxter found that Defendant Wargo is protected by this defense because he carried out the community notification in compliance with a statute that was valid at the time of his conduct. Plaintiff maintains, however, that it is immaterial that Wargo conducted the community notification in accordance with Pennsylvania's Megan's Law because, according to Plaintiff, at the time that Wargo acted, "clearly established due process and equal protection jurisprudence demonstrated that the acts required by the statute were patently unconstitutional." (Pl.'s Obj. [Doc. No. 31] at p. 7.)

█ Courts have recognized that when a statute authorizes official conduct which patently violates fundamental constitutional principles, an officer enforcing the statute is not entitled to qualified immunity. *See, e.g., Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir.1994). On the other hand, where an official acts pursuant to a statute that he reasonably believes to be valid and lawful, the official will be immune from liability even if the statute is subsequently found to be unconstitutional. *See id.* (recognizing the general principle that "where a police officer has probable cause to arrest someone under a statute that a reasonable officer could believe is constitutional, the officer will be immune from liability even if the statute is later

held to be unconstitutional"). Thus, the question becomes whether the defendant official acted in accordance with a statute that was patently unconstitutional or whether, to the contrary, the statute was one that a reasonable officer in his position could have believed was lawful and valid.

Plaintiff maintains that the contours of his equal protection claim were clearly elucidated as early as 1969 when the Supreme Court decided *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). In *Shapiro*, the Supreme Court affirmed a series of rulings striking down three statutory provisions that denied welfare assistance to residents of Connecticut, the District of Columbia, and Pennsylvania who had resided within those respective jurisdictions less than one year immediately preceding their applications for assistance. Proponents of the statutory waiting-periods had attempted to justify them primarily as a means of protecting the public fisc for the benefit of long-time residents by deterring the influx of indigent newcomers. *Id.* at 627–28, 89 S.Ct. 1322. Recognizing that the right to travel throughout the United States is a basic constitutional right, the Court observed that the deterrence of indigent immigration could not serve as a justification for the laws because such a purpose would be constitutionally impermissible. *See id.* at 631, 89 S.Ct. 1322 ("If a law has 'no other purpose ... than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it (is) patently unconstitutional.' ") (alterations in original) (quoting *United States v. Jackson*, 390 U.S. 570, 581, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968)). Thus, according to Plaintiff, *Shapiro* made it clear that states may not treat recently migrated individuals differently from longstanding residents, especially not for the purpose of deterring

shall enter an order dismissing the same with

prejudice.'').

their migration. *See id.* 394 U.S. at 629–30, 89 S.Ct. 1322.

 We do not agree that *Shapiro* renders Defendant Wargo's conduct patently unconstitutional because—as the Magistrate Judge's Report and Recommendation illustrates—the legal analysis of Plaintiff's equal protection claim requires a degree of intellectual gymnastics far beyond a mere face-value reading of *Shapiro.* The critical determination driving the Magistrate Judge's equal protection analysis is her finding that the community notification provisions of Pennsylvania's Megan's Law II infringed Plaintiff's fundamental right to engage in interstate travel. We concur with, and adopt, this basic premise with the following modification: the community notification to which Plaintiff was subjected in accordance with Megan's Law I, *as it was applied in this case,* violated his fundamental right to travel. It is the abridgement of this fundamental right that triggers strict scrutiny review and thus requires the Defendant to show that the disputed governmental action was narrowly tailored to serve some compelling state interest. *See, e.g., Maldonado v. Houstoun,* 157 F.3d 179, 184, 188–89 (3d Cir.1998). The Magistrate Judge's determination that Plaintiff's fundamental right to travel was burdened in this case is, in turn, driven largely by the Supreme Court's decision in *Saenz v. Roe,* 526 U.S. 489, 500, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999), wherein the Court clarified that the fundamental right to travel encompasses the right of individuals to establish residency within a new state and, upon doing so, to be treated like other citizens of that state. 526 U.S. at 500, 119 S.Ct. 1518. Significantly, though, *Saenz* was not decided until 1999—well after Defendant Wargo conducted the community notification in this case.

Furthermore, there was historically disagreement even within the Supreme Court itself with respect to the appropriate constitutional jurisprudence applicable to claims brought by newly established state citizens, as a comparison of the majority and dissenting opinions in *Saenz* demonstrates. Although the *Saenz* majority analyzed the "right to travel" claim under the Privileges and Immunities Clause of the Fourteenth Amendment, Chief Justice Rehnquist disagreed with this approach:

... I cannot see how the right to become a citizen of another State is a necessary "component" of the right to travel, or why the Court tries to marry these separate and distinct rights. A person is no longer "traveling" in any sense of the word when he finishes his journey to a State which he plans to make his home ... The right to travel and the right to become a citizen are distinct, their relationship is not reciprocal, and one is not a "component" of the other.... At most, restrictions on an individual's right to become a citizen indirectly affect his calculus in deciding whether to exercise his right to travel in the first place, but such an attenuated and uncertain relationship is no ground for folding one right into the other.

526 U.S. at 513–14, 119 S.Ct. 1518 (Rehnquist, Chief J., dissenting). Chief Justice Rehnquist acknowledged the fundamental proposition that a "citizen of the United States can, of his own volition, become a citizen of any State of the Union by a *bona fide* residence therein, with the same rights as other citizens of that State." *Id.* (Rehnquist, Chief J., dissenting) (citing *Slaughter–House Cases,* 83 U.S. 36, 16 Wall. 36, 80, 21 L.Ed. 394 (1872)). However, Chief Justice Rehnquist maintained that these claims should be analyzed under the Equal Protection Clause in terms of whether they impermissibly "penalize" individuals for having exercised their right

to travel. *Id.* at 514–15, 119 S.Ct. 1518. Thus, while the majority opinion in *Saenz* is now binding precedent, Justice Rehnquist's dissent illustrates that there has been disagreement even as to which constitutional provisions are implicated by the type of "right to travel" claim presented in this case.

This debate is not without significance because, under the Equal Protection line of cases including *Shapiro,* courts have not been uniform in applying strict scrutiny in "right to travel" cases. As Chief Justice Rehnquist noted, the Supreme Court's traditional approach had been to analyze, under equal protection principles, whether certain state imposed restrictions "amounted to 'deprivations of very important benefits and rights' that operated to indirectly 'penalize the right to travel.'" 526 U.S. at 515, 119 S.Ct. 1518 (citing *Attorney General of N.Y. v. Soto–Lopez,* 476 U.S. 898, 907, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986) (plurality opinion)). Thus, in some cases, the restriction of certain benefits or services has been deemed a "penalty" to newly migrated state residents, thereby triggering a strict scrutiny review. *See, e.g., Shapiro,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (striking down state imposed 1–year residency requirement as a prerequisite to receiving welfare benefits); *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (striking down state law which conditioned the right to vote in state elections on 1–year residency requirement); *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 280–83, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (1–year county residency requirement which was prerequisite for entitlement to nonemergency hospitalization or emergency care struck down). "In other cases," however, "the Court [has] recognized that laws dividing new and old residents had little to do with the right to travel and merely triggered an inquiry into whether the re-

sulting classification rationally furthered a legitimate government purpose." 526 U.S. at 515, 119 S.Ct. 1518 (Rehnquist, C.J., dissenting) (citing *Zobel v. Williams,* 457 U.S. 55, 60, n. 6, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982); *Hooper v. Bernalillo Cty. Assessor,* 472 U.S. 612, 618, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985)). This Circuit has similarly acknowledged the lack of uniformity in the Supreme Court's approach to "right to travel" cases prior to *Saenz. See, e.g., Maldonado v. Houstoun,* 157 F.3d 179, 185 (3d Cir.1998) ("Regrettably ... the law with respect to the constitutional implications of the right to travel is unsettled and in need of clarification. The Court has at times subjected durational residence laws that impinge on the right to travel to strict scrutiny ... and at other times to what appears to be some form of a heightened rational basis test.") (internal and concluding citations omitted).

■ The equal protection analysis in this case is further complicated by Plaintiff's status as a convicted parolee. Neither *Shapiro* nor *Saenz* (nor any of the cases analyzed therein) involve challenges to a state law that implicate a parolee's right to travel. In fact, as a general proposition, convicted persons (including parolees) enjoy no fundamental right to travel. *See Bagley v. Harvey,* 718 F.2d 921, 924 (9th Cir.1983); *Alonzo v. Rozanski,* 808 F.2d 637 (7th Cir.1986). While the Magistrate Judge ultimately reasoned that Plaintiff's right to travel was revived by virtue of his approved parole transfer-a conclusion which this Court is willing to accept-we have located no case law which sheds specific light on the extent to which a parolee's constitutional *right* to travel is revived by operation of transfers accepted under the Parole Compact. Nor have we located any cases analyzing the community notification provisions of Pennsylvania's Megan's Law I or II in the context of an equal protection challenge raised by an out-of-state sexual offender.

■ In addition, once one accepts the proposition that Plaintiff *did* have a "revived" constitutional right to travel—and that Wargo's community notification subjected Plaintiff to disparate treatment (as compared to in-state sexual offenders) in a manner which burdened that right—the inquiry still is not over. It then becomes necessary to consider whether the government has a compelling purpose justifying the disparate treatment and whether the classification is narrowly drawn to achieve that purpose. To an officer acting under instructions to enforce a facially valid law, it is not always self-evident whether his application of the law would pass or fail a strict scrutiny review. This is especially true given the fact that Megan's Law I required the Parole Board to determine whether community notification was appropriate in Plaintiff's case. A reasonable officer in Defendant Wargo's position could well believe that his conduct in carrying out the Parole Board's determination did not offend equal protection principles.

■ We likewise conclude that Defendant Wargo is entitled to qualified immunity as it relates to Plaintiff's due process claim. Although the Pennsylvania Constitution and case law clearly acknowledge reputation as among those fundamental interests protected by state due process principles, *see* PA. CONST. ART. I, § 11; *Simon v. Commonwealth*, 659 A.2d 631, 637 (Pa.Cmwlth 1995), it was not until *Commonwealth v. Halye*, 719 A.2d 763 (Pa.Super.1998) (*en banc*) that a Pennsyl-

vania appellate court specifically addressed constitutional due process principles in the context of the community notification provisions of Megan's Law. In *Halye*, the Pennsylvania Superior Court ruled that 42 Pa.C.S.A. § 9794 (West 1998) violated federal due process principles by impermissibly shifting to the defendant the burden of rebutting his status as a sexually violent predator, and it struck down all provisions of Megan's Law I relating to "sexually violent predators." 719 A.2d at 768. Among the court's concerns was the fact that, under Megan's Law I, persons designated "sexually violent offenders" were significantly impacted in their ability to maintain a private life by virtue of the community notification procedures, and they also faced significantly enhanced penalties, including a mandatory maximum sentencing requirement of life imprisonment. *Id.* The latter concern did not apply to out-of-state sexual offenders like Plaintiff, since out-of-state sex offenders were not subjected to the mandatory maximum sentence of life imprisonment. In sum, not only was *Halye* decided *after* the date of Defendant Wargo's conduct, but it involves concerns about certain penalties that did not apply in Plaintiff's case.

Plaintiff, however, refers us to *E.B. v. Verniero*, 119 F.3d 1077, 1081 (3d Cir. 1997), for the proposition that, as of 1997, it was clearly established that "subjecting an individual to community notification without first providing procedural safeguards is unconstitutional." (Pl.'s Obj. at p. 8.) [10] In *E.B.* the Third Circuit held that

**10.** Plaintiff also relies on the case of *Specht v. Patterson*, 386 U.S. 605, 609–10, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967) for the proposition that "offenders are entitled to a hearing at which they are afforded the 'full panoply of the relevant protections which due process guarantees' in state criminal proceedings' before being subject to a sex offender's act." (Pl.'s Obj. at p. 8 n. 2.) In *Specht,* the petitioner had been convicted under a Colorado stat-

ute for "indecent liberties," a crime which carried a maximum sentence of 10 years imprisonment. The petitioner was not sentenced under that statute, but was instead sentenced under Colorado's Sex Offenders Act for an indeterminate term of one day to life. Colorado law permitted the Sex Offenders Act to be applied whenever the trial court was of the opinion that the defendant, if at large, would "constitute[ ] a threat of bodily

the notification provisions of New Jersey's Megan's Law require the state to justify the relevant classification and notification plan by clear and convincing evidence. 119 F.3d at 1081. Thus, *E.B.* concerned the Third Circuit's interpretation of an entirely different Megan's Law statute as promulgated by the New Jersey legislature. Instrumental in the court's due process analysis was its conclusion that the New Jersey State Constitution afforded a constitutional liberty interest in privacy deserving of due process protection, *see* 119 F.3d at 1105—an issue similar to, but analytically distinct from, that which we face here. This Court, therefore, is not persuaded that *E.B.* renders Defendant Wargo's conduct objectively unreasonable.

Moreover, *E.B.* (like *Halye*) did not address the unique situation posed by Plaintiff's status as an out-of-state sexual offender. At the time that Defendant Wargo carried out the community notification regarding Plaintiff, Pennsylvania's Megan's Law I gave the Commonwealth parole board the discretion to determine whether or not an out-of-state sexual offender whose parole was being transferred to Pennsylvania should be subject to community notification. *See* 42 Pa. C.S.A. § 9795(c) (West 1998). As a practical matter, the Pennsylvania Board of Probation and Parole had a policy of requiring community notification for all such out-of-state parolees; however, the statute itself did not mandate community notification in these situations, nor did it specifically require or prohibit any particular due process relative to community notification for out-of-state parolees.[11] Defendant Wargo was not in a position to know what specific process, if any, had been afforded in connection with the Parole Board's determination. Simply stated, a reasonable officer in Defendant Wargo's position would not necessarily have known that he was assisting in the deprivation of Plaintiff's due process

harm to members of the public, or is an habitual offender and mentally ill," and certain additional conditions were met. 386 U.S. at 607, 87 S.Ct. 1209. In *Specht,* the petitioner brought a habeas corpus action challenging his sentence under the Sex Offenders Act, which had been imposed without notice and a full hearing. The Supreme Court held that the invocation of the Sex Offender's Act essentially constituted the incorporation of a new charge leading to criminal punishment without the benefit of the required due process. For these reasons, the Court held that the Colorado statute was unconstitutional. *Id.* at 608–11, 87 S.Ct. 1209. We find that *Specht* is materially distinguishable, both factually and legally, from the case at bar and is therefore not helpful to our analysis.

11. It is true that in-state sexual offenders could not be subjected to community notification under Megan's Law I unless they were first deemed to be "sexually violent predators." It is also true that Megan's Law I mandated certain procedures for the determination of "sexually violent predator" status

(albeit procedures that were later struck down in *Halye* and *Commonwealth v. Williams,* 557 Pa. 285, 733 A.2d 593 (1999) as constitutionally deficient), which did not apply to out-of-state offenders like Plaintiff. Moreover, the statute contained no corresponding procedures relative to out-of-state parolees who were subjected to community notification. But, as the *Halye* Court noted, it is also true that in-state violators who were deemed to be "sexually violent predators" faced significantly enhanced sentencing penalties—including a mandatory maximum sentence of life imprisonment and a mandatory life imprisonment sentence upon a subsequent conviction for a sexually violent offense—which were not applicable to out-of-state sexual offenders like Plaintiff. Thus, there was an obvious disparity in procedural safeguards afforded in-state sexual offenders versus out-of-state offenders. However, a reasonable officer in Defendant Wargo's position could have viewed this discrepancy as constitutionally justified by the fact that in-state offenders were potentially subjected to much harsher consequences under Megan's Law I than their out-of-state counterparts.

rights simply by carrying out the public notification mandated by the Pennsylvania Parole Board.

 Generally speaking, when a statute or ordinance authorizes particular conduct, courts have considered this factor to be one which militates in favor of the conclusion that a reasonable official would find the conduct lawful. *Grossman,* 33 F.3d at 1209 (citing cases). Here, the relevant provision of Megan's Law I gave the Pennsylvania Parole Board discretion to determine whether public notification of Plaintiff's criminal history was in the best interest of public safety. Pursuant to that provision and its own policy, the Parole Board directed the State Police to engage in community notification in Plaintiff's case. Defendant Wargo was then required to enforce this specific mandate. A reasonable officer in Wargo's position could have believed his own participation to be not only lawful, but required by law. "In the end, ... an officer who reasonably relies on the legislature's determination that a statute is constitutional should be shielded from personal liability." *See Grossman,* 33 F.3d at 1210. We think this case is no exception. While we ultimately agree with Magistrate Judge Baxter's recommendation that Plaintiff has established a violation of both his equal protection and due process rights, the legal analysis that brings us to that conclusion is not so transparent as to suggest a patent constitutional defect in the community notification procedures carried out here—particularly when those procedures are viewed in the light of then-existing law. The Court therefore finds that Defendant Wargo is entitled to the defense of qualified immunity in this case.

**Prayer for Injunctive Relief**

Finally, Plaintiff asserts that, even if the Court grants qualified immunity to Defendant, there are extant claims for declaratory and injunctive relief which must remain open. In his *pro se* complaint, Plaintiff sought a declaratory judgment "that the [D]efendant's acts, policies, and practices described herein violate the Plaintiff's rights under the U.S. Constitution." (Pl.'s Compl. [Doc. No. 7] at p. 3.) Plaintiff also requested injunctive relief that:

a. requires the Pa. State Police, including Defendant Wargo[,] to clarify to the Oil City Police, media, director of day care, school officials, neighbors or the Plaintiff, and anyone else that was misinformed that:

The Plaintiff is not a dangerous child molester, nor a sexual[ly] violent predator, nor sentenced under Megan's law, nor on a life time of parole, no[r] has any court of law deemed the Plaintiff to be any of these;

b. prohibits the defendant, agents and employee's [sic], and all other person's [sic] in active concert and participation with him from harassing, threatening, punishing, or retaliating in any way against the Plaintiff because he filed this action.

(*See id.* at p. 4.)

Insofar as Plaintiff's request for declaratory relief is concerned, the Magistrate Judge's Report and Recommendation, as adopted by this Court, functionally serves as a declaration that the community notification carried out in this case violated Plaintiff's federal equal protection and due process rights. The Court's Order herein effectively closes that aspect of the case, as no purpose is served by additional litigation; the essential issues have been fully litigated and decided.

 With regard to Plaintiff's request for injunctive relief, we conclude that such relief is inappropriate here. Injunctive relief in any form is an "extraordinary remedy" that should be granted only in "limited circumstances." *AT & T v.*

*Winback and Conserve Prog. Inc.*, 42 F.3d 1421, 1426–27 (3d Cir.1994) (citations omitted). The test for granting a permanent injunction is the same as the test for granting a preliminary injunction. *United States v. Miami University*, 91 F.Supp.2d 1132 (S.D.Ohio 2000), *aff'd*, 294 F.3d 797 (6th Cir.2002). In making a determination on a preliminary injunction, a district court must consider: (1) the likelihood of success on the merits; (2) the extent of irreparable injury from the alleged misconduct; (3) the extent of irreparable harm to the defendant if the injunction issues, and (4) the effect on public interest. *Clean Ocean Action v. York*, 57 F.3d 328, 331 (3d Cir. 1995). The standard applicable to permanent injunctions differs only in that the plaintiff must show actual success on the merits rather than a mere likelihood of success. *See Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 392, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)).

 Irreparable injury is established by showing that the plaintiff will suffer harm that "cannot be redressed by a legal or an equitable remedy following trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) ("The preliminary injunction must be the only way of protecting the plaintiff from harm."). The plaintiff bears this burden of making a "clear showing of immediate irreparable injury," *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir.1989) (citation omitted), which is more than merely serious or substantial harm. *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987). The case law provides some assistance in determining that injury which is irreparable under this standard: "The word irreparable connotes 'that which cannot be repaired, retrieved, put down again, atoned for …'." *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir.1994) (citation

omitted). Additionally, "the claimed injury cannot merely be possible, speculative or remote." *Dice v. Clinicorp, Inc.*, 887 F.Supp. 803, 809 (W.D.Pa.1995). "Establishing a risk of irreparable harm is not enough." *Id.* (citing *ECRI*, 809 F.2d at 226).

 Plaintiff's *pro se* prayer for injunctive relief is inappropriately defined. There is simply no possibility of future irreparable injury as Plaintiff's injury was already complete when this action was filed. Additionally, Plaintiff no longer resides in the Oil City area. Thus, Plaintiff is not entitled to an injunctive order directing Defendant Wargo to clarify the information made public in 1997 as part of the community notification process. Prohibiting Defendant from retaliating against Plaintiff for the filing of this action is also not appropriate here as an injunction cannot be issued "simply to eliminate a possibility of a remote future injury," *Acierno*, 40 F.3d at 655, and there is nothing to indicate that this Plaintiff will ever come into contact with this Defendant again. Because Plaintiff cannot show irreparable injury (or the existence of future harm) Plaintiff's request for a permanent injunction is denied.

THEREFORE, this ___ day of January, 2003, following a *de novo* review of the pleadings and record in this case,

IT IS HEREBY ORDERED that the Report and Recommendation by Magistrate Judge Baxter recommending that Defendant's motion for summary judgment be granted is adopted as the opinion of this Court to the extent set forth herein.

IT IS FURTHER ORDERED that, as discussed in the body of this Memorandum Order, Plaintiff's prayer for injunctive relief is denied and Plaintiff's prayer for declaratory judgment is granted.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

BAXTER, United States Magistrate Judge.

### I RECOMMENDATION

It is respectfully recommended that Defendant's motion for summary judgment [Document # 17] be granted.

### II REPORT

Plaintiff is an out-of-state sexual offender who transferred his parole to Pennsylvania. Plaintiff brings this § 1983 action challenging his subjection to the community notification provisions of Pennsylvania's Megan's Law. Since the institution of this action, Plaintiff has been re-incarcerated in Maryland on an unrelated parole violation.

In his complaint, filed *pro se,* Plaintiff alleges:

On or about 12–8–97, Defendant Wargo carried out a public notification under Megan's Law which was initiated by a David Rockwell of the Pa. Parole Board. Defendant Wargo handed out posters to the plaintiff's neighbors, a day care center, and local schools. Defendant Wargo misinformed the public, media, and Oil City Police of the following:

A. That the Plaintiff is a dangerous child molester

B. That the plaintiff is sentenced under Megan's Law

C. That the Plaintiff was deemed by a court of law to be a sexual violent predator.

D. That the Plaintiff is on a life time of parole

E. That all of this information is a matter of public record, and

F. That the Plaintiff has no rights.

The facts are that the Plaintiff is none of the above, nor has any court of law ever deemed the Plaintiff to be any of these. Document # 7, unnumbered page 2.

The only Defendant named in this action is Officer David Wargo, one of two state troopers who carried out the community notification. Plaintiff claims that Defendant Wargo's actions violate his Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment rights. Plaintiff seeks injunctive and declaratory relief, as well as compensatory damages.[1]

While still acting *pro se,* Plaintiff filed a pre-trial narrative claiming his rights were violated under the *Ex Post Facto* clause, the Privileges and Immunities Clause, and the Fourth, Fifth, Eighth and Fourteenth Amendments to the U.S. Constitution. Document # 14.

Defendant has moved for summary judgment claiming that Plaintiff's Fourteenth Amendment rights to equal protection and due process have not been violated and that alternatively, Defendant is entitled to qualified immunity. Document

---

1. In the complaint, Plaintiff seeks compensatory and punitive damages from Defendant Wargo, as well as:

 1. A declaratory judgment that the defendant's acts, policies, and practices described herein violate the Plaintiff's rights under the U.S. Constitution.

 2. A preliminary and permanent injunction which:

 A. requires the Pa. State police, including Defendant Wargo to clarify to the Oil City Police, media, director of day care, school officials, neighbors of the Plaintiff, and anyone else that was misinformed

 that: The Plaintiff is not a dangerous child molester, nor a sexual violent predator, nor sentenced under Megan's law, nor on a life time of parole, no has any court of law deemed the Plaintiff to be any of these.

 B. prohibits the Defendant, agents and employee's, and all other person's in active concert and participation with him from harassing, threatening, punishing, or retaliating in any way against the Plaintiff because he filed this action.

 Document # 7, page 4.

# 17. In the motion for summary judgment, Defendant does not address Plaintiff's Fourth, Fifth, Sixth or Eighth Amendment claims, or the Ex Post Facto and Privileges and Immunities claims.[2]

Plaintiff, through his newly obtained counsel, filed a brief in opposition to the motion for summary judgment, raising for the first time the issue of the Interstate Compact on Parole and Probation (and *Doe v. Ward*, 124 F.Supp.2d 900 (W.D.Pa. 2000), which held that the community notification provisions of Pennsylvania's Megan's Law violate the Interstate Compact). Defendant has not filed a reply to the opposition brief. On August 5, 2002, this Court heard oral argument from the parties on the pending motion for summary judgment.[3]

## A. Factual Background

In December of 1984, Plaintiff was convicted in Maryland of rape in the second degree and sentenced to twenty years in prison. In January of 1995 (after serving 10½ years), Plaintiff was paroled on the Maryland charge. The terms of his Maryland parole did not require that he be subjected to community notification. Plaintiff was required to serve an additional (and unrelated) twenty-two month sentence and was finally released from custody on November 28, 1996.

**2.** Defendant concludes "As recited above, Plaintiff alleges that community notification violates his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution. The only arguments that have arguable merit are his claims under the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment. Therefore defense counsel will focus on those claims in his brief." Document # 18, page 3, n. 1.

**3.** At oral argument, Plaintiff's counsel acknowledged that they were relying on Plaintiff's due process and equal protection claims.

In January of 1995, Plaintiff was permitted to transfer his parole to Pennsylvania (where his mother resides), pursuant to the Interstate Compact on Probation and Parole. The day after his eventual release Plaintiff complied with the registration requirements of Pennsylvania's Megan's Law and reported his current address and telephone number to law enforcement officials.

Between November 1996 and April 1997, Plaintiff obtained employment, property, a vehicle, and industrial sewing equipment in an effort to start an upholstery shop by January of 1998. In his pre-trial narrative statement, Plaintiff claims that between April of 1997 and December of 1997, he completed psychological counseling and was determined by the counselor not to be a sexually violent predator.

On December 8, 1997, approximately 13 months after his release, Defendant Wargo carried out a community notification by distributing fliers to members of the community and school officials in Plaintiff's hometown, which stated that Plaintiff was a Megan's Law sexual offender subject to community notification under the statutory provisions governing sexually violent offenders. The fliers contained Plaintiff's name, address and photo.

## B. Pennsylvania's Megan's Law [4]

Document # 28, page 37. This Court will not address Plaintiff's other constitutional claims.

**4.** The Third Circuit's decision in *E.B. v. Verniero*, 119 F.3d 1077 (1997), relates the history of Megan's Law:

On July 29, 1994, Megan Kanka, a seven year old child, was abducted, raped and murdered near her home. The man who confessed to Megan's murder lived in a house across the street from the Kanka family and had twice been convicted of sex offenses involving young girls. Megan, her parents, local police, and the members of the community were unaware of the accused murderer's history; nor did they

The statute sets forth the purpose of the registration of sexual offenders:

It is hereby declared to be the intention of the General Assembly to protect the safety and general welfare of the people of this Commonwealth by providing for registration and community notification regarding sexually violent predators who are about to be released from custody and will live in or near their neighborhood.

42 Pa. Cons.Stat. Ann. § 9791(b) (emphasis added). To accomplish this goal, the current version of the law creates two separate levels of notification: 1) registration with the local law enforcement agencies and 2) community notification. This case revolves around the community notification provision as applied to in-state offenders and out-of-state offenders.

The community notification provisions apply only to in-state offenders adjudicated as "sexually violent predators" and all out-of-state offenders (regardless of their offense) who have transferred their probation to the Commonwealth. 42 Pa. Cons. Stat. Ann. § 9798 and 61 Pa.Cons.Stat. Ann. § 331.33(d)(3)(i). The community notification is carried out by the chief law enforcement officer of the area through fliers that contain the offender's photo, name, address and some indication that he is a Megan's Law offender.

Prior to ordering community notification of an in-state offender, the Act provides a comprehensive assessment procedure to determine whether the offender is a sexually violent predator. First, the State Sexual Offenders Board evaluates the in-state offender. The Board reviews the nature of the offense, the circumstances surrounding the offense and the offender's character and history. The Board submits a written report containing its assessment to the district attorney. If upon reviewing the Board's assessment, the district attorney believes community notification is warranted, he must file a praecipe with the Court of Common Pleas, request a hearing, and serve the praecipe and the Board's report on defense counsel. An adversarial hearing, with full trial procedures, is held to determine whether the offender is a sexually violent predator. 9795.4(e). At this hearing, the Commonwealth bears the burden of proving by clear and convincing evidence that the offender is a "sexually violent predator." The offender has a right to be heard, and to call and cross-examine witnesses, including expert witnesses. He has a right to counsel, with counsel appointed if he cannot afford a private attorney.

By contrast, Megan's Law requires that all out-of-state offenders (who transfer parole to Pennsylvania) be subject to the community notification provisions, regardless of their offense of conviction or their potential dangerousness to the community. The Act provides that any "individual ... who is paroled to the Commonwealth pursuant to the interstate compact or the supervision of parolees and probationers shall, in addition to the [registration] requirements..., be subject to the requirements of section 33 of the act ...". 9795.4(e)(2). The referenced provision provides that the parolee must "submit to mandatory registration and public notifica-

know that he shared his house with two other men who had been convicted of sex offenses. *Id.* at 1081. Public reaction to Megan's murder was intense and state and federal legislatures responded quickly. Following New Jersey's adoption of the first Megan's Law, "other states followed suit with their own versions of Megan's Law and Congress passed a statute requiring a state program of registration and community notification as a condition of receiving certain federal funds. By May of 1996, forty-nine states had adopted sex offender registration laws and thirty-two states maintained some form of community notification program." *Id.*

tion of all current addresses." 331.33(d)(3)(i).

There is *no procedural mechanism* by which an out-of-state offender is determined to pose a danger to the community, thereby triggering the community notification provisions. While an in-state offender is given the benefit of adjudicatory process to determine if he will be subject to community notification, the out-of-state offender who transfers his parole automatically triggers the community notification provisions.

## C. Standard of Review

Defendant's motion for summary judgment is an assertion that Plaintiff's claims are legally insufficient. Defendant does not argue that Plaintiff could not offer facts in support of his claim; nor does Defendant offer evidence to dispute facts alleged by Plaintiff. The only evidence offered by Defendant is his own declaration asserting that he acted in good faith in carrying out the community notification. Defendant's declaration only goes to the defense of qualified immunity and is irrelevant to the purely legal questions of whether Plaintiff's constitutional rights were violated and whether the community notification requirements for out-of-state offenders violate the Interstate Compact of Parole and Probation. At the oral argument, the parties agreed that Defendant's motion for summary judgment is more properly a motion for judgment on the pleadings, and this Court will review it as such. See Document #28, Transcript, pages 21 and 48.

A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is treated using the same standard as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Eisen v. Temple University*, 2002 WL 1565284 (E.D.Pa. June 28, 2002), *citing Turbe v. Government of*

*Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991). Dismissal is warranted only if it appears beyond doubt that the party asserting the claim "can prove no set of facts in support of his claim which would entitled him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 796 (3d Cir.2001).

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) must be viewed in the light most favorable to the plaintiff and all the well-pleaded allegations of the complaint must be accepted as true. *Neitzke v. Williams*, 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338(1989); *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The motion cannot be granted unless the court is satisfied "that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The issue is not whether the plaintiff will prevail at the end but only whether he should be entitled to offer evidence to support his claim. *Neitzke; Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Rule 8(a) of the Federal Rules of Civil Procedure states that a pleading must set forth a claim for relief which contains a short and plain statement of the claim showing that the pleader is entitled to relief. Therefore, in order to survive a motion to dismiss for failure to state a claim, the complaint must set forth sufficient information to suggest that there is some recognized legal theory upon which relief can be granted.

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears " 'beyond a doubt that the plaintiff can prove

no set of facts in support of his claim which would entitle him to relief.'" *Haines v. Kerner,* 404 U.S. 519, 520–521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), *quoting Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should be done so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. *Boag v. MacDougall,* 454 U.S. 364, 102 S.Ct. 700, 70 L.Ed.2d 551 (1982); *Nicholson v. U.S.,* 141 F.2d 552, 554 (3d Cir.1969)(petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"); *U.S. v. Rodney,* 956 F.2d 295 (D.C.Cir.1992); *Freeman v. Department of Corrections,* 949 F.2d 360 (10th Cir.1991). Plaintiff was a *pro se* litigant when this action was filed, the complaint will be reviewed with some degree of leniency.

### D. Interstate Compact on Probation and Parole Analysis

#### 1. Applicability

Plaintiff has advanced several constitutional arguments in support of his position. Although not raised in either the complaint or in Defendant's motion for summary judgment, this Court must first address the issue of the Parole Compact. This Court has a well-established duty "to avoid passing upon a constitutional question *if the case may be disposed of on some other ground.*" *Spicer v. Hilton,* 618 F.2d 232, 239 (3d Cir.1980). The Third Circuit has unequivocally stated that

> the compulsion to avoid premature constitutional decisions is so strong that this court has previously held that it supersedes even our customary concern with orderly presentation on the issues. That is also true where, as here, the

non-constitutional basis for the decision was [not] raised in the pleadings . . .

*Id.* at 240–241 ("The Supreme Court has on several occasions even applied the doctrine when the non-constitutional ground was not presented by the parties but was first noticed by the Court itself.").

In the Opposition Brief to the motion for summary judgment, Plaintiff's counsel raised the issue of the inconsistencies between the Pennsylvania statute and the Interstate Compact on Parole and Probation for the first time. At the hearing on this motion, Defendant agreed that the Parole Compact issue must be addressed at the outset. Document # 28.

#### 2. Jurisdiction

Before this Court may consider the Interstate Compact issue, it must initially determine whether the Compact is a state or federal law. This question is jurisdictionally determinative. While "the Supreme Court has never ruled on the issue of whether the interstate parole compact is federal law," the Honorable Robert Cindrich of this district court has held that the Interstate Compact on Probation and Parole is both a state and federal law. *Doe v. Ward,* 124 F.Supp.2d 900, 910 (W.D.Pa. 2000). We agree with Judge Cindrich's jurisdictional analysis:

> The [Supreme] Court explained in *Cuyler* [*v. Adams* 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981) ] that an interstate compact is transformed into federal law when 1) it falls within the scope of the Constitution's Compact Clause, 2) it has received congressional consent, and 3) its subject matter is appropriate for congressional legislation. The interstate compact satisfies each of these conditions.
>
> First the need to assert cross-border control of people subject to the jurisdiction of the criminal justice system,

whether individuals with detainers or parolees, is a matter that falls within the scope of the Constitution's Compact Clause. Second, the interstate parole compact has received congressional consent. In fact, the legislative source of the congressional consent is the same for both the IAD [Interstate Agreement on Detainers—the subject of Cuyler] and the interstate parole compact. Lastly, the subject matter is appropriate for congressional legislation, as the need for interstate co-operation to monitor and control parolees is the same as it is for inmates with detainers.

Accordingly, we hold that the Parole Compact, as a congressionally sanctioned interstate compact, is a federal law as well as state law. We further hold, therefore, that this court has subject matter jurisdiction to interpret and apply the Parole Compact.

*Doe,* 124 F.Supp 2d at 911–912.

An interstate compact is a unique form of law and "takes precedence over statutory law in member states." *McComb v. Wambaugh,* 934 F.2d 474, 479 (3d Cir. 1991). "Having entered into a contract, a participant state may not unilaterally change its terms." *Id.See also Aveline v. Pennsylvania Bd. of Probation and Parole,* 729 A.2d 1254, 1257 n. 10 (Pa.Cmwlth. 1999) ("...the Contract Clause of the United States Constitution protects compacts from impairment by the states. This means that upon enacting a compact, it takes precedence over the subsequent statutes of signatory states and, as such, a state may not unilaterally nullify, revoke, or amend one of its compacts, if the compact does not so provide.").

The Interstate Compact, in pertinent part, provides:

> That each receiving state will assume the duties of visitation of, and supervision over, probationers or parolees of any sending state, and, **in the exercise of those duties, will be governed by the same standards that prevail for its own probationers and parolees.**

61 P.S. § 321(2) (emphasis added). By subjecting out-of-state parolees to community notification requirements in a different way than in-state parolees are subjected to community notification, the Commonwealth of Pennsylvania is, in effect, amending section (2) of the Interstate Compact. *See Doe,* 124 F.Supp.2d at 915 (The Commonwealth "... essentially changes the terms of the Parole Compact as it places additional conditions on the transfer of parolees and probationers who, like Doe, [otherwise] satisfy the [...] requirements of the Parole Compact.").

Our inquiry does not end here, however. "[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. University of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Therefore, it must be determined whether a private cause of action (and remedy) exists within the Interstate Compact.

This is where this case parts company with the *Doe* decision. In *Doe,* the plaintiff was granted injunctive relief based upon a violation of the Interstate Compact, in order to avoid a constitutional review of these state provisions.[5] Here, we find that

---

**5.** "Without ruling on the constitutional issues, we hold, based on a plain reading of the Parole Compact, that the Board did not have the authority under the facts of this case to either reject or place extraneous conditions of community notification on Doe's move to Pennsylvania and that Doe must be provided with the same process as is provided to in-state sex offenders before subject[ing] him to community notification." *Doe,* 124 F.Supp.2d at 916.

Plaintiff does not have a private right of action under the Interstate Compact because one cannot be inferred from its terms. See Section D. 3. below. Thus, we are required to engage in a constitutional analysis of Plaintiff's claims. See Section E. below.

### 3. Implied Cause of Action

Like substantive federal law, "private rights of action ... must be created by Congress." *Alexander v. Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). *See also Gonzaga University v. Doe,* 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). The analysis to determine whether a private cause of action exists within a given statute was first set forth in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). There, the Supreme Court promulgated a four-prong test:

1) whether Plaintiff is a member of the class "for whose especial benefit the statute was enacted";

2) whether there is evidence of legislative intent to create or preclude the relief sought;

3) whether the relief sought is consistent with the legislative scheme; and

4) whether the relief sought is the type that is "traditionally relegated" to states, such that federal relief would interfere with the state scheme.

*Id.* at 78, 95 S.Ct. 2080.

Although the *Cort* test is still good law, subsequent Supreme Court decisions have stressed the paramount importance of a threshold inquiry to determine whether it was the intent of Congress to create a private remedy. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981); *Thompson v. Thomp-*

*son,* 519 U.S. 1044, 117 S.Ct. 615, 136 L.Ed.2d 540 (1996). The latest of the Supreme Court cases on this issue indicates that if this threshold inquiry is answered in the negative, the analysis ends there. *Alexander v. Sandoval,* 532 U.S. 275, 288, 121 S.Ct. 1511, 149 L.Ed.2d 517 ("We therefore begin (and find that we can end) our search for Congress' intent with the text and structure of Title VI.").

Recently, the Supreme Court reiterated the analysis necessary to determine whether a private cause of action exists within a given statute:

> We must first determine whether Congress *intended to create a federal right.* Thus, we have held that "the question whether Congress intended to create a private right of action is definitively answered in the negative" where "a statute by its terms grants no private rights to any identifiable class." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 576, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). For a statute to create such private rights, its text must be "phrased in terms of the persons benefitted." *Cannon v. University of Chicago,* 441 U.S. 677, 692 n. 13, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) ... But even where a statute is phrased in such explicit rights-creating terms, a plaintiff suing under an implied *right* of action still must show that the statute manifests an intent "to create not just a *private right* but also a *private remedy.*" *Alexander v. Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

*Gonzaga University,* 536 U.S. at 282–83, 122 S.Ct. at 2275 (emphasis in original).

A review of the full text of the Interstate Compact[6] does not reveal any Congressional intent to create a federal right or remedy. The language of the Compact

---

**6.** See Appendix A for the full text of the Inter- state Compact.

focuses only on the authority of the states to enter into reciprocal arrangements for the supervision of parolees and probationers with Congress' blessing. Nowhere is the Compact "phrased in terms of the persons benefitted," *Cannon v. University of Chicago*, 441 U.S. at 693 n. 13, 99 S.Ct. 1946, and even if such an interpretation can be made, the Compact speaks in terms of the states' rights to mutually assist each other for parole transfers "in the prevention of crime and for other purposes." No discussion of the probationer's or parolee's interest is found anywhere in the Compact. Indeed, none of the requirements listed in *Cort v. Ash*, and explained in subsequent decisions, is found in the four corners of the Interstate Compact.

Insomuch as a right is not implied, so too a remedy cannot be found in the Compact, and both are required. *Alexander*, 532 U.S. at 286, 121 S.Ct. 1511 ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a *private right* but also a *private remedy*...."). Without Congressional intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.*

At best, the Compact mandates that contracting states comply with its terms in order to bring uniformity to the control of transferring parolees for the benefit of law enforcement as a whole. So, although the Megan's Law community notification provisions as applied to out-of-state offenders violate the Interstate Compact, as determined by *Doe*, Plaintiff does not have a private cause of action under it, especially against this Defendant. Because of this result, the constitutional claims raised by Plaintiff must be reached.

### E. Constitutional Analysis

### 1. Equal Protection

### a. Standards of Review

Plaintiff argues that the disparate treatment accorded out-of-state parolees under Pennsylvania's Megan's Law violates his rights to equal protection as it restricts his fundamental right to interstate travel. Defendant argues that Plaintiff's claim fails as a matter of law because a parolee has no right to travel (and because parolees are not a suspect class for purposes of an equal protection analysis). Defendant further claims that Plaintiff's claim is subject to rational basis scrutiny and passes constitutional muster under such minimal scrutiny. Document # 18.

Plaintiff's opposition brief clarifies Plaintiff's equal protection argument. Plaintiff claims that he should be treated like similarly situated Pennsylvanians; i.e., persons who have been convicted of a sexually-related offense in Pennsylvania and are on parole. Document # 25. More specifically, Plaintiff's counsel clarifies that Plaintiff's argument for strict scrutiny is not based on membership in a suspect class, but only on his fundamental constitutional right to travel.

The Equal Protection Clause provides that no state shall "deny to any person ... the equal protection of its laws." U.S. Const. Amend. XIV, § 1. All persons "similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Artway v. New Jersey*, 81 F.3d 1235, 1267 (3d Cir. 1996). The basic methodological framework of an equal protection analysis is well settled. The level of scrutiny to which a challenged restriction is subject is dependent upon the nature of the right implicated. Initially, the court must make a threshold determination of the appropriate

standard of review it will apply to the challenged classification. The choice is made from among three standards: strict scrutiny, intermediate scrutiny and rational basis scrutiny.

The equal protection analysis requires strict scrutiny of a legislative classification only when the classification either impermissibly interferes with the exercise of a fundamental right [7] or operates to the peculiar disadvantage of a suspect class. Fundamental rights have been held to include: the right to vote [*Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972)]; the right of interstate travel [*Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969)]; rights guaranteed by the First Amendment [*Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)]; the right to procreate [*Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942)]; and right of a uniquely private nature [*Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, (1973)]. In order for an infringement to pass constitutional muster under strict scrutiny, the government must demonstrate that the infringement is necessary to promote a compelling state interest and is narrowly tailored to meet that end. *Saenz v. Roe*, 526 U.S. 489, 504, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999).

Certain quasi-suspect classifications, such as gender and illegitimacy, are subject to an intermediate form of scrutiny under equal protection principles and will be upheld if they are substantially related to a sufficiently important governmental interest. *United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996); *Mississippi University for Women v. Hogan*, 458 U.S. 718, 102 S.Ct. 3331, 5 Ed. Law Rep. 103 (1982); *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

All remaining classifications [8], as well as restrictions on non-fundamental rights, are subject to the highly deferential rational basis test. For a restriction to pass constitutional muster under rational basis scrutiny, it must only be rationally related to a legitimate state interest. *Kimel v. Florida Board of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). "It is enough that there is an evil at hand for correction and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Artway v. Attorney General of New Jersey*, 81 F.3d 1235, 1268 (3d Cir.1996) (when presented with a equal protection challenge to the New Jersey Megan's Law, the court held "registration easily satisfies this [rational basis] requirement. Protecting vulnerable individuals from sexual offenders is certainly a legitimate state interest. Requiring registration of convicted sex offenders found to be 'repetitive and compulsive,' as opposed to other sex offenders or the rest of the population, is rationally related to that goal."). In order to be upheld, "legislative classifications need not be perfect or ideal." *Marshall v. United*

---

**7.** Suspect classes have been limited to race [*Brown v. Bd. of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)], national origin [*Oyama v. California*, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948)], and alienage [*Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971)].

**8.** Other classes have been held to be non-suspect classes. *Harris v. McRae*, 448 U.S.

297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (indigency not a suspect classification); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (age not a suspect classification); *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 41, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (mentally retarded citizens do not constitute a suspect class).

*States,* 414 U.S. 417, 428, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974).

Plaintiff argues that the Megan's Law community notification provisions as applied to out-of-state offenders impact his fundamental right to interstate travel, thereby triggering strict scrutiny. Defendant argues that because parolees have no right to travel, Plaintiff's claim should be analyzed under the rational basis test.

**b. Right to Travel as expanded by Saenz v. Roe**

The right to travel from state to state is constitutionally protected. *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Recently, the Supreme Court breathed new life into the Privileges and Immunities Clause and ruled definitively that the right to travel encompasses three distinct components:

> It protects the right of a citizen of one state to enter and to leave another state, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second state, and, **for those travelers who elect to become permanent residents, the right to be treated like other citizens of that state.**

*Saenz v. Roe,* 526 U.S. 489, 500, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999) (emphasis added).

The *Saenz* Court reached back in history to the *Slaughter–House Cases,* 16 Wall. 36, 83 U.S. 36, 21 L.Ed. 394 (1872), to revive the rights conferred by the Privileges and Immunities Clause "that a citizen of the United States can, of his own volition, become a citizen of any State of the Union by a bona fide residence therein, with the same rights as other citizens of that State." *Id.* at 503—504, 119 S.Ct. 1518. *Saenz* quoted the *Slaughter–House Cases:*

> the states have not now, if they ever had, any power to restrict their citizen-

ship to any classes or persons. A citizen of the United States has a perfect constitutional right to go to and reside in any State he chooses, and to claim citizenship therein, and an equality or rights with every other citizen . . .

*Id.* at 503, 119 S.Ct. 1518.

The *Saenz* dissent vociferously disagreed with the majority's new component of the right to travel:

> But I cannot see how the right to become a citizen of another state is a necessary "component" of the right to travel, or why the Court tries to marry these separate and distinct rights. A person is no longer "traveling" in any sense of the word when he finishes his journey to a state which he plans to make his home. Indeed, under the court's logic, the protections of the Privileges and Immunities Clause recognized in this case come into play only when an individual stops traveling with the intent to remain and become a citizen of a new state. The right to travel and the right to become a citizen are distinct, their relationship is not reciprocal, and one is not a "component" of the other.

*Saenz,* at 513, 119 S.Ct. 1518.

At issue for Mr. Lines is this third component of the right to travel that was criticized by the *Saenz* dissent: the right for a new permanent resident to be treated like other citizens of the state. The *Saenz* Court characterized the third component as: "the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State" and explained that "[t]hat right is protected not only by the new arrival's status as a state citizen, but also by her status as a citizen of the United States." *Id.* at 502, 119 S.Ct. 1518. The Court went on to articulate that "[d]espite fundamentally differing views concerning the coverage of the Privilege and Immunities

**676**

Clause of the Fourteenth Amendment, ... it has always been common ground that this Clause protects the third component of the right to travel." *Id.* at 503, 510–11, 119 S.Ct. 1518. ("Citizens of the United States, whether rich or poor, have the right to choose to be citizens of the State wherein they reside. The states, however, do not have any right to select their citizens.").

### c. Parolees and the right to travel

It is without question that convicted felons lose certain rights upon conviction and imprisonment. *See Morrissey v. Brewer,* 408 U.S. 471, 478, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) ("... [c]onditions [of parole] restrict [a parolee's] actions substantially beyond the ordinary restrictions imposed by law on an individual citizen."); *United States v. Loy,* 237 F.3d 251, 259 (3d Cir.2001) ("As a convicted felon sentenced to a term of supervised release, Loy's constitutional rights do not have the same scope as those of ordinary citizens."). Defendant cites decisions from outside this judicial district and Circuit in support of his argument that parolees (as convicted felons) have no right to travel. That none of these cases has any precedential authority in this Court is of no moment as they are all off the mark and all were decided before *Saenz v. Roe.*

Defendant cites the Ninth Circuit's *Bagley v. Harvey* decision for the proposition that a conviction extinguishes the right to travel and parole does not automatically revive the extinguished right. 718 F.2d 921 (9th Cir.1988). The *Bagley* court, when confronted with the alleged unconstitutionality of a special parole condition that prevented Mr. Bagley from reentering the state of his residence prior to incarceration, held

> There can be no doubt that Bagley's constitutional right to interstate travel was extinguished upon his valid conviction and imprisonment. **Since, to date, Bagley has never regained that freedom of travel he lost upon conviction,** he may not invoke the Due Process Clause of the Fifth Amendment to compel the Government to grant him the desired right.

718 F.2d at 924 (emphasis added). Bagley's situation was different than Plaintiff's situation. While Mr. Bagley was prevented from travel, Mr. Lines was permitted to travel and to transfer his parole from Maryland to Pennsylvania under the Interstate Compact.

Defendant also cites *Rizzo v. Terenzi,* 619 F.Supp. 1186 (E.D.N.Y.1985), and *Alonzo v. Rozanski,* 808 F.2d 637 (7th Cir. 1986), for the proposition that parolees have no right to travel. The *Rizzo* court upheld a travel restriction as a condition of parole for two federal parolees. The district court of New York held that where the express terms of the parolees' release precluded travel outside the district without written permission by their parole officer, parolees had no "right" to travel outside the district in the absence of such approval. 619 F.Supp. 1186. The court noted that the "...viability of a parole system depends on the ability to monitor and control travel." *Id.* at 1189. Mr. Rizzo's situation is not analogous to the case at hand as Mr. Lines had been given permission to travel outside the state of his incarceration and his parole had been officially transferred from Maryland to Pennsylvania under the Interstate Compact.

In *Alonzo,* a parolee filed a petition for writ of habeas corpus challenging the denial of his relocation request claiming that the probation officer's decision was arbitrary and capricious and denied him due process of law. In analyzing the *due process* claim, the court held that as a parolee, Alonzo did not have a due process liberty interest in relocating out of state. *Id.* at 637.[9] Mr. Alonzo had not been given per-

---

9. The district court held:

Alonzo committed crimes, and the punish-

ment for these crimes includes stripping

mission to travel and relocate out of state. By contrast, Mr. Lines had been given such permission and had, in fact, relocated from Maryland to Pennsylvania.

Defendant also cites *Paulus v. Fenton* (443 F.Supp. 473 (M.D.Pa.1977)) as stating that "a parolee's status is closer to that of an incarcerated prisoner than to that of a free citizen." *Id.* at 476 n. 8. The *Paulus* court was presented with a petition for writ of habeas corpus by a federal prisoner challenging his probation officer's failure to formulate a parole plan of petitioner's liking. While *Paulus* held that "[p]arole is, in many respects, a continuation of confinement ..." *Id.* at 476, the court did not directly address whether parolees have a right to travel and so, is not helpful for our purposes here.

In all of Defendant's cases the parolee was prohibited from traveling prior to any traveling having occurred. In the case at hand, Maryland and Pennsylvania actually encouraged (or at the least, acquiesced in) Plaintiff's travel, and by allowing him to transfer his parole from one state to another, revived his fundamental right to travel. It was only after Plaintiff's rights were restored to him that he exercised those rights. Defendant cannot now claim that Plaintiff's right to travel has been extinguished by his conviction.

#### d. Strict Scrutiny

Because the fundamental right to travel is implicated by the Megan's Law provisions, under the equal protection framework, this Court must apply strict scrutiny to the challenged law. In order for an infringement to pass constitutional muster under strict scrutiny, the government must demonstrate that the infringement is necessary to promote a compelling state interest and is narrowly tailored to meet that end. *Saenz*, 526 U.S. at 504, 119 S.Ct. 1518. It is the government's burden to meet both parts of the strict scrutiny test. *Republican Party of Minnesota v. White*, 536 U.S. 765, 122 S.Ct. 2528, 2534, 153 L.Ed.2d 694 (2002).

By refusing to recognize that a heightened scrutiny standard was appropriate here, Defendant has not advanced any argument on behalf of the state that there was a compelling state interest, which was narrowly addressed by the law. It is not for the Court to speculate on a defendant's reasons for a law, compelling or otherwise. Here, however, Defendant did offer the reasons for the notification requirements of out-of-state offenders—albeit, under the rational basis test: 1) a local community would not have heard about an out-of-state trial and conviction through normal public discourse or the media, and, alternatively,

him of control over where he shall live. While in prison Alonzo had no say at all about where he could go.... Alonzo's control of abode was extinguished, for the entire term of his sentence, by the judgment of conviction. Some choice was restored to Alonzo when he was paroled, but Alonzo received no more than statutes and binding regulations gave him. How much freedom Alonzo received is a question of positive rather than natural law. Positive law allows a parolee to move without restraint in the district of his release, unless the conditions attached to his parole enlarge or restrict that liberty. Alonzo does not claim that any statute, regulation, or term of his

release gives him an interest in living outside Illinois.
*Id.* at 637, 89 S.Ct. 1322. *See also Benson v. United States*, 969 F.Supp. 1129, 1134 (N.D.Ill.1997) (comparing *Alonzo* holding in the face of a First Amendment challenge) ("Benson is in the same boat as Alonzo. When he was convicted and incarcerated, Benson gave up a substantial amount of his freedom, including, obviously, his freedom to live or travel outside of prison walls. Now that he is paroled, Benson has been restored some freedom, but still is restricted by the terms of his parole from traveling outside of the ... district.... without his parole officer's permission.").

2) the state does not wish to encourage convicted sex offenders to move to Pennsylvania.

The latter argument mirrors the argument rejected by the Supreme Court as to welfare recipients in *Saenz*, and can fare no better under these facts for the same reasons. *See also Maldonado v. Houstoun*, 157 F.3d 179, 189 (3d Cir.1998). The former argument is simply not a true statement; in fact, taking Defendant's first reason to its logical conclusion, notification requirements for in-state offenders becomes unnecessary.

While it may be the case that a local community has no way of knowing the background of out-of-state sexual offenders, the same is also true for in-state offenders, and in fact, is the basis for Megan's Laws generally. The reason that legislatures are requiring community notification at all is because communities do not know who their new neighbors are despite an ever-present media, and even when the new neighbors were convicted within their own state. This is precisely what happened in the Megan Kanka case: Megan's killer was an in-state twice convicted sexual offender, a fact unknown to his new neighbors, who moved into a house in Megan's neighborhood after his release from prison. Under Defendant's faulty argument, a community in Philadelphia would know more about a trial of a sex offender in Erie, Pennsylvania, than in Camden, New Jersey. And, this is certainly not the case. There are many reasons why in-state offenders are as unknown to communities as out-of-state

ones—the transience of the population, the length of time between a trial and the release from prison of an offender, the sheer size of the population of most cities and towns—and, in fact, these reasons have been offered in support of Megan's Laws in general. But, there is simply no support for Defendant's contention to the contrary, in the record or otherwise, and it must be rejected.

Accordingly, the reasons offered by Defendant for the disparate treatment of out-of-state sexual offenders fall far short of satisfying the heightened scrutiny test.

### 2. Due Process

The Fourteenth Amendment provides that no state "... shall [...] deprive any person of life, liberty, or property, without due process of law." U.S.C.A. Const. Amend. 14. In analyzing a procedural due process claim, the first step is to determine whether the nature of the interest is one within the contemplation of the liberty language of the Fourteenth Amendment. *See Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). A protected liberty interest may arise from the Constitution itself or from state-created statutory entitlement. *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

Defendant claims that Plaintiff has no liberty interest and so is not entitled to any procedural due process.[10] Document #18. In the opposition brief, Plaintiff claims that he has a liberty interest in being free from governmental defamation

---

**10.** To the extent that Defendant argues that Plaintiff waived his rights to procedural due process by signing the transfer documents, that issue is inappropriate for a judgment on the pleadings. The documents in question are not before this Court. *But see Doe*, 124 F.Supp.2d at 916 ("on a final note, the defendants argue that Doe waived the process accorded in-state offenders prior to community

notification when applying for a transfer, as he agreed to comply with the conditions of the receiving state in the transfer application. We disagree. Doe's transfer application is not sufficiently detailed to effectuate such a waiver. The proviso acknowledging an agreement to comply with the receiving state's conditions of probation is written in general terms.").

and in his privacy, as protected by the U.S. Constitution, and in his privacy and reputation as protected by the Pennsylvania Constitution, and so, is entitled to federal procedural due process protections. Document # 25.

The Pennsylvania Constitution provides: All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life, **liberty of acquiring, possessing and protecting property and reputation,** and of pursuing their own happiness.

Pa. Const. Art. I, Section 11. Additionally, the Pennsylvania Superior Court has acknowledged that the community notification provisions of Megan's Law implicate the constitutional protections of due process, *Commonwealth v. Halye,* 719 A.2d 763, 767 (Pa.Super.1998) (*en banc*), and "the Pennsylvania Constitution established reputation as one of the fundamental rights that cannot be abridged without compliance with state constitutional standards of due process," *Simon v. Commonwealth,* 659 A.2d 631, 637 (Pa.Cmwlth. 1995).

As there is a liberty interest in reputation under the Pennsylvania Constitution, this Court need not examine Plaintiff's claims of a liberty interest protected by the U.S. Constitution. *See E.B.,* 119 F.3d at 1105 ("We need not reach the issue of whether appellants have a liberty interest recognized by the federal Constitution because we are satisfied that appellants have a liberty interest created by the New Jersey Constitution of which they cannot be deprived without being accorded the process due under the Fourteenth Amendment.").[11]

After a liberty interest is found, the next step in the due process inquiry is to determine what process is due. "Due process ... is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar,* 520 U.S. 924, 930, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). At a minimum, due process requires notice and the opportunity to be heard. *Paul v. Davis,* 424 U.S. 693, 724, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.").

An analysis of what process is due and what process was received by Plaintiff is necessarily avoided here as Defendant admits that no process was afforded Plaintiff pursuant to the provisions of Pennsylvania's Megan's Law. Document # 18. Moreover, no record has been developed to indicate otherwise. Therefore, having determined that Plaintiff had a state-created liberty interest at stake and received no due process under the law, a procedural due process violation has occurred.

### F. QUALIFIED IMMUNITY

Defendant claims that he is entitled to qualified immunity. The doctrine of qualified immunity insulates government officials from liability for damages insofar as their conduct does not violate clearly established rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73

---

**11.** *See also Artway,* 81 F.3d at 1268–69 ("Artway has no such [life, liberty or property] interest in the reputational damage, if any, that accompanies *registration,*" but suggesting that there may be a federal "liberty interest in *notification* under state law triggering federal due process protections. But, as explained, ... his challenges to notification are not yet ripe.").

L.Ed.2d 396 (1982). An officer performing his discretionary functions is "shielded from liability for civil damages insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir.2002). "Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

The Supreme Court has repeatedly emphasized the importance of resolving the immunity questions at the earliest possible stages of a case. *Anderson v. Creighton*, 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727. However, "the imperative to decide qualified immunity issues early in the litigation is in tension with the reality that factual disputes often need to be resolved before determining whether the defendant's conduct violated a clearly established constitutional right." *Curley*, 298 F.3d at 277. Although this case is over two and half years old, the current motion for summary judgment is the first dispositive motion in this case. This Court was not presented with the opportunity to decide the issue of qualified immunity before this time.

The analytical framework that district courts should employ in determining whether qualified immunity applies is clearly established:

> The Court explained that a qualified immunity analysis must begin with this threshold question: do the facts alleged, viewed in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right? *Saucier*, 121 S.Ct at 2156. If the plaintiff fails to allege the violation of a constitutional right, no further inquiry is necessary. If, however, the alleged facts show that there was a constitutional violation, then the next step is to ask whether the right was clearly established. *See id.* In other words, a court must consider whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.* This inquiry, the Court noted, must be undertaken in light of the specific context of the case, not as a broad general proposition. *Id.* If a court concludes that an officer's conduct did violate a clearly established constitutional right, then it must deny him the protection afforded by qualified immunity. *See id.* at 2156–57.

*Curley*, 298 F.3d at 277. *See also Hope*, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666; *Doe v. Delie*, 257 F.3d 309 (3d Cir. 2001).

This Court has already addressed the threshold question in this Report and Recommendation finding that Plaintiff's constitutional rights to equal protection and due process were violated. The next step in the analysis is to determine whether the constitutional rights were clearly established at the time of the violation. *Hope*, 536 U.S. 730, 122 S.Ct. 2508. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Recently, the Supreme Court observed:

> for a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the

length of pre-existing law the unlawfulness must be apparent.

*Hope,* 536 U.S. at 738–39, 122 S.Ct. at 2515.

Police officers who act in accordance with a valid statute may generally use qualified immunity as a defense. Federal courts have held that the existence of a valid statute favors the conclusion that a reasonable official would find the conduct constitutional. *Grossman v. City of Portland,* 33 F.3d 1200, 1209 (9th Cir.1994). The Supreme Court has excused a police officer "…from liability for acting under a statute that he reasonably believed to be valid but that was later held unconstitutional, on its face or as applied." *Gomez v. Toledo,* 446 U.S. 635, 639, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), *quoting Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

It is undisputed by the parties that Defendant Wargo carried out the community notification in compliance with Pennsylvania's Megan's Law, a statute that was valid at the time of the notification. As such, Defendant is entitled to qualified immunity for his actions and the inquiry ends there.

As the federal courts within this Commonwealth continue to hear these cases brought by out-of-state parolees under the community notification provisions of Megan's Law, the framework under which the notification is made, may be chipped away as violative of the United States Constitution and real relief may eventually be won for these re-locating offenders. However, this is not that case, against this Defendant, for that result under the law.

### III CONCLUSION

For the foregoing reasons, it is respectfully recommended that Defendant's motion for summary judgment [Document # 17] be granted.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Lo-

cal Rule 72.1.4B, the parties are allowed ten (10) days from the date of service to file written objections to this report. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. No extensions of time will be granted. Failure to timely file objections may constitute a waiver of any appellate rights.

Aug. 30, 2002.